## The People v. James Curtis.

*Homicide—Threats—Evidence of disposition—Calibre of weapon—Interference to protect another—Insults.*

1. In a prosecution for homicide committed in a riotous affray among neighbors and apparently in defense of a brother, all facts leading thereto and connected with it should be admitted, including the conduct of other participants besides respondent, and especially of those who provoked the assault. The dangerous character of the deceased and his disposition when drunk are also material; and so would be the fact that the person in whose behalf respondent interposed was afraid deceased would cut him as he had others.

2. If, upon a prosecution for a homicide done in an affray, declarations of malignant purpose are shown that were made by respondent before the killing, his remarks accompanying them should also be received in order to determine whether the threats were not mere brag.

3. Where, in a case of killing by pistol shot, it had been shown on post mortem examination that the shot was too large for the pistol respondent claimed to have, it was also necessary to show that the fatal shot came from respondent's pistol; and when it had been shown that two shots were fired, it was important, independently of any claim that respondent fired both shots, to know who else had pistols.

4. A man has a right, in a riotous affray, to interfere for the protection of a brother who is in personal danger whether the brother was blameless or not. And the use of a deadly weapon in such interference does not of itself show malice where neither began the affray and there had been no space for cooling time nor opportunity to withdraw safely.

5. A dangerous felony may be forcibly prevented by any one who is not himself in the wrong directly or by complicity.

6. Coolness and deliberation cannot be required of those who are concerned in a riotous and exciting affray involving a considerable number of persons; and the absence of these qualities cannot fairly be treated as aggravating the acts of persons not originally in the wrong.

7. It is not good law to hold that though insulting language will not justify a dangerous assault, yet if it has provoked one it precludes the person who used it from resisting the assault and deprives others of the right to interfere for his protection.

Error to Cass. (A. J. Smith, J.) Jan. 29.—Feb. 8.

INFORMATION for murder. Respondent brings error. Reversed.

*Spafford Tryon* and *Harsen D. Smith* for respondent appellant. Where evidence of threats is given the context must be shown: *Ben v. State* 37 Ala. 103; *Stokes v. People* 53 N. Y. 164; *Bearss v. Copley* 10 N. Y. 93; *Rouse v. Whited* 25 N. Y. 170; *Platner v. Platner* 78 N. Y. 103; one who commits homicide in resisting an attack may show the character of the deceased for violence: *Brownell v. People* 38 Mich. 735; *Hurd v. People* 25 Mich. 419; *Pritchett v. State* 22 Ala. 39; *Franklin v. State* 29 Ala. 14; *State v. Hicks* 27 Mo. 588; *Dukes v. State* 11 Ind. 557; *State v. Turpin* 24 Am. 456; *State v. Keene* 50 Mo. 357; *State v. Dumphey* 4 Minn. 438; Hor. & Thomp. Cases on Self Defense 695; *Fields v. State* 47 Ala. 603; inten-

tional homicide is not necessarily malicious: *Maher v. People* 10 Mich. 225; *Pond v. People* 8 Mich. 150; *People v. Lilly* 38 Mich. 270; as to the duty to avoid violence, see *Sharp v. State* 19 Ohio 388; *Stoffer v. State* 15 Ohio St. 47; 1 Hale P. C. 480; *State v. Ingold* 4 Jones N. C. L. 216; *Hodges v. State* 15 Ga. 117; *Long v. State* 52 Miss. 35; *Patten v. People* 18 Mich. 333; *Erwin v. State* 29 Ohio St. 186; *Campbell v. People* 16 Ill. 17; *Ross v. State* 38 Am. 795; *Judge v. State* 29 Am. 707; *Runyan v. State* 57 Ind. 80 : 36 Am. 52.

Attorney General *Jacob J. Van Riper* for the People. Testimony as to the violent character of a person killed in a fight is inadmissible in a prosecution for his murder if the person killing him did not know his character: *People v. Lamb* 2 Keyes 360; *State v. Hicks* 27 Mo. 588; *Reynolds v. People* 17 Abb. 413; Wharton on Hom. 229; *State v. Field* 14 Me. 244; Wharton's Crim. Law § 641; *People v. Garbutt* 17 Mich. 9; and the accused must have done everything in his power to avoid doing harm: *Schnier v. People* 23 Ill. 17.

CAMPBELL, J. Curtis was, tried in the Cass county circuit court and convicted of murder in the second degree. Errors are assigned on rulings during the trial and in instructions to the jury. Macom Wilson was the person killed.

The facts bearing on the case are these. On the 15th day of August, 1883, the respondent with many others attended a colored people's celebration at a place called Osborn's Grove, in Calvin township. Clay Wilson, a brother of deceased, had a temporary grocery on these premises near the south end, east of the north and south highway. Levi Wilson, another brother, was in the company, as well as Ami Curtis, a brother of respondent. After the celebration was ended, and just in the edge of the evening, Levi Wilson and Ami Curtis got into an altercation. Levi had a knife which according to some of the witnesses he used

in a threatening manner towards Ami.. He also had stones which he threw at the latter. There is some doubt just how this fight began, but they were chasing each other round a wagon that stood there, when Macom Wilson came up and threw a stone at Ami Curtis and as some witnesses swore was threatening him further with another stone, when he was shot by some one claimed to have been respondent. It is agreed that respondent fired a revolver, and that deceased was killed by a ball of 32-caliber, while respondent claims his revolver was much smaller. Several witnesses testify to another shot about the same time, which was not fired by respondent.

The controversy was—*First*, whether respondent shot deceased at all; and *second*, if he did, whether the act was murder, manslaughter or innocent homicide. The bearing of most of the questions presented is towards the degree of blame, if any. Some questions bear on the entire absence of complicity in the shooting.

A number of objections apply to the admission or exclusion of testimony as to sayings and doings of respondent and others during the earlier part of the afternoon. The testimony indicated that the crowd consisted of neighbors and persons acquainted, and it appears that during the final quarrel there was a crowd at the place of the fight, and some noise and excitement.

The first question discussed arises out of the reception by the court of declarations made by respondent at 2 o'clock in the afternoon on the grounds. On objection made to the question whether respondent made threats, the court remarked: "Suppose he said he meant to kill the first person he met, and then did it,—the witness may answer." The witness then swore—"I heard the defendant say he was going to knock down three men and kill one, before he left the ground." Defendant's counsel moved to strike out this as not referring to deceased. The court struck out what was said about knocking down, and left what was said about killing; and this threat, as the court treated it, was made prominent in the subsequent charge of the court as to malice.

Whether this declaration was admissible or not, it was in our opinion wrong to strike out the part relating to knocking down three men. Taken all together it was open to the natural construction that it was no more than braggadocio, while standing alone it might have a more serious meaning. The whole statement should have been let in or all ruled out.

The court allowed other evidence of defendant's talk of a similar character to be shown, but refused to allow testimony that Levi Wilson was stropping his knife on his boot and trying to cut people and made threats, and that other persons made similar threats.

This difficulty was thus allowed to be shown to have had some connection with the previous gathering and yet evidence was only allowed as to defendant's conduct, while that of others was shut out. In our view all of the transactions of the afternoon were proper and should have been received. There is a great deal of testimony indicating more or less commotion and disturbance in the afternoon, and it is impossible not to see that many things might have been made much more intelligible, if this testimony had been let in fully instead of partially and only as it bore against the respondent. All of the Wilsons as well as some others were mixed up in the disturbance, and defendant's conduct must be viewed in the light of all the surroundings. This is especially true as to Levi and Macom Wilson, whose conduct was the apparent provocation to defendant's assault, if he committed one, and must necessarily have a close relation to his excusability. It was as much defendant's right to inquire into their conduct and appearance, as if he had himself been the person assaulted instead of his brother.

It appeared on the post mortem examination that the bullet was larger than would fit the pistol which defendant claimed to have been in his possession. When the prosecution gave evidence that defendant had fired a revolver, and another of their witnesses testified he heard a revolver go off and saw Macom Wilson shot, but did not know who shot him, but that he saw defendant have a revolver, the

prosecuting attorney asked what was the size of defendant's revolver. The court interrupted him and said : " Mr. Carr, you have shown that this bullet was found in the body of Macom, that this bullet killed him, and defendant fired, and that is enough, and the size of the revolver has nothing to do with the case, and you need not go into the size of the revolver at all at this stage of the trial." This was not only a statement of fact made in such a way as to tell the jury a case had been made out, which the court has no right under such circumstances to do, but it-prevented the prosecutor from doing his duty to the prisoner, by giving all of his testimony fairly in the opening. It was an essential part of the prosecutor's case to show that the ball came from defendant's pistol, and it was his duty to do this by making —as he seemed disposed—a full showing.

James Byrd testified that he saw defendant at the time of the affray and that his revolver was a small one of 22 calibre, and that there were two shots fired. He testified on cross-examination that there were several persons having revolvers out, and that these were of different sizes, but he was not allowed on re-examination by defendant to tell what persons he saw with such revolvers, the court saying it was immaterial if they were not the persons engaged in this affray. As there was no claim that defendant fired two shots, and as it was certain that such a revolver, as he was shown by witness to have had, could not have been the weapon that killed the deceased, this testimony was of obvious importance. And it was error to shut out any of the immediate surroundings of the affray. If defendant did not do the killing it is evident some one else took a most important part in this affray, and it was important to know who it was.

Ami Curtis, the brother of respondent, gave a very full account of the difficulty, and of the conduct of the two Wilsons and the attack on himself, and among other things said he backed up from Levi Wilson when he came at witness with his knife, because witness was afraid he would cut him, as he had cut several men, and witness was afraid

he would do so to him. The court struck this out, and also refused to allow witness to testify as to Levi's character as to peaceableness when in liquor. The materiality of this testimony cannot be doubted. Respondent was witness's brother and claims to have acted in his defense, and the danger to Ami was the occasion for it. It is manifest that a violent and quarrelsome man, armed and aggressive, would make any sensible person apprehensive of mischief and justify him in seeking protection. Moreover in this case, in his charge, the court very strongly urged the fault of Ami Curtis in this affray as chargeable not only to himself but to respondent. Other testimony of violent conduct of Levi was also shut out, as well as evidence of his quarrelsome character. The testimony showed that all of the persons concerned were neighbors, and this character could not have been properly ignored in any such controversy and quarrel. There was much other very direct testimony of his actual violence that day ruled out. All this was against the right of the prisoner, and actually tended to his prejudice.

The charge is objected to on several grounds most of which relate to what was said concerning the duties and liabilities of persons in such affrays. Much of the charge is based on assumptions of duty which may arise in cases where there are but two persons engaged, and there are no exciting surroundings, but which are not appropriate when there is such a riotous affray as appeared here. It is not in our judgment admissible to require of persons involved in such a tumultuous scene the possession of coolness and deliberation. It is unavoidable in such scenes for the participants to lose their self-control to some extent, and coolness would often be the strongest evidence of malice in one who commits violence under such circumstances.

The respondent was entitled and bound to take an interest in the life and safety of his brother. There was no difference in the testimony as to his being in danger, and all the instructions which confined the right of respondent to helping him only when he was entirely without fault were

unwarranted. The court refused to charge that a brother might interpose against a felonious or serious bodily harm, unless the assailed party was entirely blameless, and this was contrary to the well-settled principle that a dangerous felony may be prevented by one who is not himself in the wrong, directly or by complicity.

It was not, we think, proper to charge as a matter of law that the use of a deadly weapon by respondent was a strong circumstance tending to show malice. On the contrary we have had great doubt whether it was proper in this case to leave the question of malice to the jury at all. The case was one of those fights in which usually there could be no guilt worse than manslaughter in any one who acted on provocation. Neither respondent nor his brother began the affray, and we have discovered no testimony authorizing the inference that there was space for cooling time, or opportunity for withdrawal by Ami without danger. It is unreasonable to regard their reciprocal advances and retreats as creating each time new rights and duties.

The court charged repeatedly that if Ami was in fault at all, respondent could not be justified, and the court told the jury that if Ami had made an insulting remark in Levi's presence, although not sufficient to justify an assault it was so far liable to provoke as to put Ami in fault and deprive him of his rights, and put respondent in fault for defending him. This is not supported by any authority and is a dangerous doctrine. It is equivalent legally to saying that while words will not justify a dangerous assault they will preclude a person from resisting it, and in that respect the charge was altogether inconsistent. To hold, as was here intimated, that it put a man in the wrong so as to deprive him of all defensive rights in an affray begun by the other party is entirely unwarranted.

We do not think it desirable to go at length into the charge, which appears to us to be throughout open to the criticism that it bore very heavily against respondent and subjected him to such restrictions and presumptions as would make it almost impossible for any one to interpose

to save his relatives from brutality and danger. We have indicated sufficiently the character of the errors relied on, and we abstain from multiplying remarks on similar questions which would require the same criticism.

The judgment must be reversed and a new trial ordered. The prisoner must be remanded to the custody of the sheriff of Cass county, and must be allowed bail if he desires it, in a moderate amount.

The other Justices concurred.