PEOPLE *v.* WRIGHT

1. HOMICIDE—MURDER—EVIDENCE—QUESTION OF FACT.

A jury question was raised whether the defendant was guilty of murder where there was evidence that the defendant, knowing of his codefendant's intention to commit murder and of the victim's desire to quit the struggle in which he had been engaged with the codefendant, went to get a gun for his codefendant and the gun was used as the murder weapon.

2. HOMICIDE—MURDER—DEFENSES—SELF DEFENSE—DEFENSE OF ANOTHER.

A person has the right to defend his brother; however, where the necessity for that defense ceases, the right to defend ceases.

3. HOMICIDE—MURDER—DEFENSES—SELF DEFENSE—DEFENSE OF ANOTHER.

The right of the defendant charged with murder to defend his brother no longer existed where his brother was no longer assaulted, where attempts were being made to remove the brother from the scene of the struggle in which the brother had been engaged, and where the victim of the murder, who had been struggling with the defendant's brother, expressed his desire to leave the premises and attempted to leave.

4. HOMICIDE—MURDER—MALICE—DEADLY WEAPON—PRESUMPTIONS.

A presumption of malice arises where a homicide has been committed by using a deadly weapon.

5. HOMICIDE—MURDER—MALICE—EVIDENCE.

Malice on the part of the defendant, charged with second-degree murder, was properly inferred by the jury where the defend-

REFERENCES FOR POINTS IN HEADNOTES

[1] 40 Am Jur 2d, Homicide §§ 37, 467–481.
[2, 3] 40 Am Jur 2d, Homicide §§ 170–173.
[4] 40 Am Jur 2d, Homicide §§ 263–267.
[5] 40 Am Jur 2d, Homicide §§ 263–269, 438.
[6] 40 Am Jur 2d, Homicide §§ 397–408.

ant shot the victim with a rifle and where the defendant, while fighting with the victim, twice stated that he was going to shoot the victim.

6. Homicide—Murder—Evidence—Witnesses—Psychiatrist.

Admission of a psychiatrist's testimony that the inconsistent defenses of temporary insanity and self-defense of the defendant, charged with second-degree murder, meant that the defendant wanted to escape the situation and would use the easiest or most convenient means to escape was not reversible error, if error at all, because the testimony merely stated a conclusion evident from the assertion of the inconsistent defenses and thus was superfluous and unnecessary.

Appeal from Oakland, Robert L. Templin, J. Submitted Division 2 March 3, 1970, at Lansing. (Docket No. 8,007.) Decided July 29, 1970. Leave to appeal denied February 10, 1971. 384 Mich 804.

William Joseph Wright and Gerald Emanuel Wright were convicted, respectively, of murder in the second degree and of manslaughter. Defendants appeal. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Thomas G. Plunkett,* Prosecuting Attorney, and *Dennis Donohue,* Chief Appellate Counsel, for the people.

*Kenneth A. Webb,* for defendants on appeal.

Before: Lesinski, C. J., and Quinn and Rood,* JJ.

Quinn, J. Defendants were jointly charged and tried for second-degree murder, CL 1948, § 750.317 (Stat Ann 1954 Rev § 28.549). The jury convicted William Joseph Wright as charged and it convicted Gerald Emanuel Wright of manslaughter, CL 1948, § 750.321 (Stat Ann 1954 Rev § 28.553). Following

---

* Circuit judge, sitting on the Court of Appeals by assignment.

sentence, defendants appeal. The issues raised on appeal are discussed in context with the following facts:

After work on August 31, 1967, defendants, Earl Shirley and Francis Michael Griffin, deceased, embarked on a "bar hopping" expedition which began about 11:30 a.m. and culminated with Griffin being shot to death by William Wright at the latter's home about 4 p.m. In the interval, the group visited seven bars and had ten drinks, Shirley drinking gin and the rest beer. At two of the bars, William Wright had arguments, the first time with the bartender and the second time with a female customer. The group was refused service in the first instance, and it was refused service and ordered to leave after one drink at the second bar where William caused trouble.

At the last bar the group visited, they separated temporarily, Shirley and Gerald Wright going to a nearby restaurant to eat, William Wright going to the car to sleep, and Griffin remaining in the bar. Shortly thereafter, they left this area in Shirley's car for the home of William Wright. The latter was asleep in the back seat and the other three rode in the front seat.

On arriving at the William Wright home, Gerald Wright attempted to awaken his brother and was kicked by William. When William's wife attempted to awaken him, he again started kicking and he swung at his wife with his right hand. Griffin then suggested that someone get the wife out of the car before she got hurt, and Griffin attempted to awaken William. The latter began swinging and kicking at Griffin and these two began to struggle.

At this point, Gerald Wright grabbed Griffin around the neck and Shirley grabbed Gerald. The latter desisted and Shirley induced Griffin to get out of the car. William then exited the car, started

swinging at Griffin, and told Gerald to go in the house and get a gun. There is some dispute in the testimony as to whether or not Griffin had William on the ground when the latter told his brother to get a gun. In any event, Shirley managed to separate Griffin and William, but as Shirley stood holding Griffin's arm, William again swung at Griffin and Shirley released him. William and Griffin exchanged blows, and William fell down with Griffin on top of him. It is disputed whether Griffin struck William at this time, and there is testimony that then Griffin was pounding William's head on the sidewalk.

Gerald returned from the house with a shotgun which he pointed at Griffin and said, "Get off him right now." Griffin complied and walked to the rear of Shirley's car. William then ran over to Gerald, grabbed the gun and ran at Griffin with the gun pointed in his direction, and William said he was going to shoot Griffin. The latter took the gun away from William and struck William across the back and shoulders with it, breaking the gun and knocking William to the street.

Shirley then went over to William, asked Gerald to assist with getting William in the house and said, "We'll get out of here and forget the whole thing." As Shirley was helping William up, the latter said to Gerald, "Jerry, get another gun." Griffin then said, "Let's get out of here, both these guys are nuts." Gerald started for the house and Shirley and Griffin went to the Shirley car. Before Shirley could start the car, Gerald came out of the house with a rifle, which William grabbed away from him and came toward Griffin who was on the passenger side of the car. Griffin still had part of the shotgun in his hand and he dropped it when told to do so by William. William then said, "Now, I'm going to shoot."

Griffin started backing around the car; Shirley hollered to William, "Stop it now." William took two shots at Griffin who half turned; William took more shots at Griffin who went down but William continued shooting at Griffin.

Shirley went to Griffin and said, "Can't I help you?" Griffin replied, "Just get some help." As Shirley raised up from Griffin, William said to Shirley, "I'll shoot you, too, you s.o.b.," and the trigger clicked two times.

An autopsy on the body of Griffin revealed 28 bullet wounds from 12 bullets. His blood disclosed 0.11 per cent alcohol on laboratory test. Cause of death was bullet wounds.

At the close of the people's proof, Gerald Wright moved for a directed verdict of not guilty and William Wright moved to reduce the charge against him to manslaughter. Both motions were denied and error is claimed as to each denial.

In support of his contention that it was reversible error to deny his motion for directed verdict, Gerald Wright makes two arguments. First, he did not deliver either gun to his brother nor did he comply with William's orders to get the guns pursuant to any common design, plan, or prearrangement. Hence, there is no proof which involves Gerald in the shooting of Griffin. The validity of this argument ends at the point where Gerald went to get the second gun. He then knew the intention of William and the fact that Griffin wanted to quit the struggle and leave. A jury question was presented with respect to Gerald's guilt or innocence.

Second, and relying on *People* v. *Curtis* (1884), 52 Mich 616, Gerald asserts he had a right to defend his brother. We recognize that such a right exists, but it has no application here. When Gerald went for the second gun, the necessity for defending

William had ceased. Griffin was not then assaulting William. An attempt was being made to get William up and into his house and Griffin had expressed the desire to leave the premises and attempted to do so.

In its charge to the jury, the trial court instructed on the element of malice as follows:

"Where the death is shown to have resulted from the use of a deadly weapon, in the absence of proof to the contrary, in absence of any testimony in relation to that, the presumption is that death was inflicted with malice."

Again relying on *People* v. *Curtis, supra,* William contends that this instruction constitutes reversible error.

The language of the instruction quoted above was taken from *People* v. *Collins* (1911), 166 Mich 4. Factually, *Collins* resembles this case of Wright more than does *Curtis, supra.* Additionally, the attendant circumstances to the altercation in Wright, and William's twice-announced intention to shoot Griffin furnish evidence from which the jury could infer malice. We find no error.

Prior to trial, William Wright gave timely notice of a defense to be relied on in the following form:

"You are hereby advised and notice is hereby given under the provisions MSA 28.1043 that William Joseph Wright, one of the defendants in the above caption cause, will assert as one of his defenses the defense of temporary insanity and self-defense, and he will call among others Dr. Herbert Raskin, 18510 Meyers Road, Detroit, Michigan, as a defense witness."

At trial, the only evidence of insanity was testimony by Gerald Wright that during the altercation William gave him a "crazy look", and the opinion of a defense psychiatrist, "I don't think that he pos-

sessed the mental capacity at that time on Thursday in relation to the shooting to constitute voluntary, deliberate intent to perform a specific act." William Wright had no memory of the events after the group left the last bar and until he was arrested, except for having a gun in his hands and looking down at a man on the ground with a spot of blood on his side.

On the issue of insanity, the court instructed on the defense of insanity, what the defendant must do to overcome the presumption of sanity, the burden of the people once that burden is overcome, and then instructed as follows:

"And if you believe the state, the people, have failed to prove by competent evidence beyond a reasonable doubt the sanity of the defendant, and if from all the evidence in the case there is a reasonable doubt in your minds as to the sanity of the defendant, William Wright, you will return a verdict of not guilty by reason of insanity."

In addition, the instructions differentiated between temporary or emotional insanity and passion and contained the following:

"Perhaps it may be enough to say, and leave it there, that by reason of disease, the defendant, William Wright, was not capable of knowing he was doing wrong in the particular act or if he had not the power to resist the impulse to do the act by reason of the disease or insanity, that would be an unsound mind. But it must be an unsoundness which affects the act in question and not one which does not affect it."

These instructions are very similar to the instructions approved in *People* v. *Durfee* (1886), 62 Mich 487, which is still controlling precedent. See *People*

v. *Krugman* (1966), 377 Mich 559. We find that the instructions given amply advised the jury on the subject of insanity, and that it was not error to refuse to give certain additional instructions requested by William Wright.

Finally, William Wright claims reversible error in the fact that a psychiatrist-witness for the people was permitted to testify over objection as to what the assertion of the inconsistent defenses of temporary insanity and self-defense meant to the witness. The gist of the answer was that the person asserting such defenses wanted to escape from the situation and would use the easiest or most convenient means to accomplish that purpose. The testimony was superfluous and unnecessary. It merely stated a conclusion evident from the assertion of the inconsistent defenses. If its admission was error, it was not reversible error on this record. CL 1948, § 769.26 (Stat Ann 1954 Rev § 28.1096), GCR 1963, 529.

Affirmed.

All concurred.