PEOPLE v. MARTIN
PEOPLE v. J. C. LEWIS, JR.

1. CRIMINAL LAW—INSANITY TEST—ELEMENTS.

The salient elements of the Michigan test for insanity are: (1) whether defendant knew what he was doing was right or wrong; and (2) if he did, did he have the power, the will power, to resist doing the wrongful act; this test encompasses not only a sudden overpowering, irresistible impulse but any situation or condition in which the power, "the will power" to resist, is insufficient to restrain commission of the wrongful act.

2. CRIMINAL LAW—INSANITY TEST.

Michigan test for insanity is well understood by Michigan judges; with proper amplification and explanation by the trial judge to the jury, depending upon the facts of the particular case, the Michigan Supreme Court considers it wholly adequate and fair; and it is sufficiently broad in scope so as to allow competent psychiatric testimony on all facts of a defendant's history.

3. CRIMINAL LAW—INSANITY TEST—PSYCHIATRISTS.

Michigan test for insanity, chiefly criticized for the reason that psychiatrists are unable to accommodate their concepts and evaluations of human conduct to the standards of the test, is retained, because psychiatry has been and is now in a constant state of evolvement and reevaluation; as of the present time, in any trial in which the issue of insanity is raised, there is almost certain to be wholly conflicting testimony by psychiatrists with regard to that issue, and; with all due deference for the achievements in this field of human medicine, the Michigan Supreme Court does not believe that medical knowledge has reached that state of certainty which permits it to determine what the law should be.

REFERENCES FOR POINTS IN HEADNOTES
[1–7, 9–15]  21 Am Jur 2d, Criminal Law § 31 et seq.
[8]  21 Am Jur 2d, Criminal Law § 376 et seq.

4. CRIMINAL LAW—CRIMINAL RESPONSIBILITY—MORAL MATTER—CRIMINAL INSANITY—JURY QUESTION.

Criminal responsibility, whether it be predicated initially upon "mental disease" or ignorance of "right" and "wrong", is a moral matter, the problem is to differentiate between the wholly non-deterrable and persons who are more or less susceptible to influence by law; thus, the issue of criminal insanity must be a jury question.

5. CRIMINAL LAW—JUDGES—JURY—TRIER OF FACT—CRIMINAL INSANITY—PSYCHIATRISTS—ASSISTANCE

It is the jury (or the judge if a jury is waived) who is the ultimate trier of the fact of criminal insanity; in most cases, the expert knowledge of psychiatrists can be of assistance to the jury or judge in arriving at their determination, but under our system of justice that ultimate determination rests with the court or a defendant's jury of his peers.

6. CRIMINAL LAW—NOT GUILTY BY REASON OF INSANITY—INSANITY TEST—JURIES—VERDICTS.

Juries are now advised as to the disposition of a defendant found not guilty by reason of insanity as well as what disposition would result to a defendant found guilty and what disposition would result from a finding of not guilty; guided by knowledge of the result of their verdict and the Michigan test of criminal insanity, they will now be in a much better position to arrive at a fair and just verdict.

7. CRIMINAL LAW—CRIMINAL INSANITY—ADOPTION OF NEW TEST—LEGISLATURE.

The Michigan Supreme Court has the power to adopt a new test for determining what constitutes criminal insanity, in deference to the legislature, it declines to take such action at the present time.

8. CRIMINAL LAW—JURISDICTION.

A court has the power to try a defendant regardless of the means used to bring him within the court's jurisdiction.

9. CRIMINAL LAW—WITNESSES—SEQUESTRATION—DISCRETION.

Sequestration of witnesses is a matter for the discretion of the trial court; requests to sequester should ordinarily be granted but refusal to sequester a psychiatrist, a rebuttal expert witness, was not an abuse of the trial court's discretion.

10. INDICTMENT AND INFORMATION—WITNESSES—INDORSEMENT—DISCRETION.

Indorsement on the first day of a trial of a psychiatrist who was a rebuttal expert witness was not an abuse of discretion by the trial court.

11. CRIMINAL LAW—FORENSIC PSYCHIATRIC EXAMINATION—STATUTES —PSYCHIATRISTS—TESTIMONY—OBJECTIONS.

Trial courts, by statute, have the duty to order a forensic psychiatric examination upon a showing that the defendant may be incompetent to stand trial but a psychiatrist who conducts such an examination may not be called to testify in the criminal trial if there is an objection to the admission of such testimony by the defendant (MCLA §§ 767.27a[3], 767.27a[4]).

12. CRIMINAL LAW—PLEA OF INSANITY—MEDICAL EXPERTS.

Plea of not guilty by reason of insanity is not a plea that incriminates but is just the opposite; it is a special plea in avoidance of the guilty charge and places in issue subjective factors of an individual's emotions and mind which, in the usual situation, can only be probed and evaluated by a medical expert.

13. CRIMINAL LAW—PLEA OF INSANITY—EXAMINATION BY PEOPLE'S EXPERTS.

A defendant who pleads not guilty by reason of insanity must submit himself to examination by the people's experts as ordered by the trial court to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the issue of insanity.

14. CRIMINAL LAW—PLEA OF INSANITY—MOTION FOR EXAMINATION— APPEAL AND ERROR.

Upon the entry of notice of a plea of not guilty by reason of insanity the procedure to be followed is that, prior to trial, an appropriate motion should be made to the court by the people requesting such an examination if one is desired; in the absence of a procedural guideline, the order of the trial judge for a psychiatric examination of the defendant where the people's request therefor was not made until the trial had commenced, was not erroneous; the timing of the examination is primarily in the interests of an orderly proceeding.

15. CRIMINAL LAW—PSYCHIATRIC EXAMINATION—ATTORNEY AND CLIENT—DISCRETION—CROSS-EXAMINATION.

Purpose of the psychiatric examination when a defendant pleads not guilty by reason of insanity is to afford the people the

same opportunity to evaluate defendant's condition as was afforded by defendant to his experts; counsel need not be permitted to be present if, in the opinion of the psychiatrist, counsel's presence would tend to thwart or interfere with the examination; this is not to say that in a particular case a judge may not order that counsel for a defendant be present or require that a recording be made of any interviews with a psychiatrist, these are matters better left to the sound discretion of the trial judge; basically it is assumed that, in the search for truth, a psychiatrist should be able to pursue his methodology unfettered and that the traditional methods of cross-examination will enable the judge or jury critically to scrutinize all results obtained.

Appeal from Court of Appeals, Division 3, Fitzgerald, P. J., and McGregor and O'Hara, JJ., affirming Kent, George V. Boucher, J. Submitted October 5, 1971. (No. 2 October Term 1971, Docket Nos. 53,189, 53,190.) Decided December 21, 1971. Certiorari denied June 26, 1972 by the United States Supreme Court.

28 Mich App 633 affirmed.

Charles Ronald Martin was convicted of first-degree murder. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *James K. Miller,* Prosecuting Attorney, and *Donald A. Johnston, III,* Chief Appellate Attorney, for the people.

*Cholette, Perkins & Buchanan* (by *Richard D. Ward* and *Kenneth L. Black*), for defendant Martin.

Appeal from Court of Appeals, Division 2, McGregor, P. J., and T. M. Burns and Andrews, JJ., affirming Oakland, Frederick C. Ziem, J. Submitted October 5, 1971. (No. 1 October Term 1971, Docket No. 53,303.) Decided December 21, 1971.

31 Mich App 91 affirmed.

J. C. Lewis, Jr., was convicted of rape and gross indecency. Defendant appealed to the Court of Appeals. Affirmed. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Thomas G. Plunkett,* Prosecuting Attorney, and *Frank R. Knox,* Assistant Prosecuting Attorney, for the people.

*Douglas Chartrand,* for defendant Lewis on appeal.

ADAMS, J. In both of these cases, defendants challenge the Michigan test for criminal insanity. In *Lewis,* the right of the people to conduct a psychiatric examination of a defendant is also challenged. *People* v. *Martin*

Martin appeals from a first-degree murder conviction. During the early morning of March 2, 1968, in Walker, Michigan, Martin robbed a gas station, shot and killed the two attendants. He was apprehended by Indiana State Police acting pursuant to a radio dispatch. While in custody at the county jail of LaPorte, Indiana, Martin signed a waiver of extradition. The police from Walker city arrived and took defendant back to Michigan. On March 4, 1968, Martin signed a confession which included the detailed plans he had made prior to the crime.

On August 22, defendant moved to quash the information on the ground that the court lacked jurisdiction over him because of the manner in which he was returned from Indiana. The motion was denied. Martin was found mentally competent to stand trial and was tried by Judge Boucher.

The sole issue was the defense of insanity. Four psychiatrists testified—three representing the state and one representing defendant. The three psychiatrists who examined defendant agreed that Martin was suffering from some personality disorder. Dr. Kenneth Nickel, called by the prosecution, opined that Martin had a passive-aggressive personality disorder. Dr. Nasit Tanal, whose examination concerned Martin's competency to stand trial, felt defendant was suffering from a schizophrenic reaction. Dr. Wolfgang May, called by the defense, stated that defendant was mentally ill during the commission of the crime and termed this illness a combination of dissociation, dissociative reaction, and overwhelming of the superego. Dr. May testified that during the commission of the crime Martin did not know the difference between right and wrong and was operating under an irresistible impulse. The state's psychiatrists disagreed with both conclusions.

The fourth psychiatrist, Dr. Ames Robey, called on rebuttal by the prosecution over defense counsel's objections, stated that a schizophrenic could know right from wrong and resist an impulse to commit a crime.

The trial court found that Martin did know right from wrong, could resist an impulse to commit the crime, and concluded that he was guilty of murder. The court found that if Michigan accepted the *Durham* "product" test, defendant could be found not guilty by reason of insanity.

Martin contests his conviction on three grounds: 1) the Indiana waiver of extradition signed by him is invalid for failure to comply with MCLA § 780.1 *et seq.* (Stat Ann 1954 Rev § 28.1285[1] *et seq.*), and Indiana Burns Ann Stat § 9–419 *et seq.*, for failure to apprise defendant of the charge of mur-

der and because, as a minor, Martin was not competent to waive his rights; 2) the trial court erred in permitting Dr. Robey to be indorsed after the trial had begun and in refusing to grant defense counsel's request to have Dr. Robey sequestered; and 3) the trial judge erred in not applying the *Durham* "product" test of insanity.

*People* v. *Lewis*

On November 25, 1968, at about 2:30 a.m., Joan Carper observed J. C. Lewis, Jr., peeking into the room in her apartment where she was about to go to sleep. Lewis attacked and beat her. He remained in her apartment for about four hours, during which time he attempted several times to rape her, forced her to commit fellatio, and finally consummated intercourse. He was arrested the next day at school. After receiving the proper *Miranda*[1] warnings, he signed a full confession which was found to be voluntary.

The first day of trial, the prosecution moved that the court order defendant to undergo a psychiatric examination by a prosecution-selected psychiatrist. Defendant's attorney objected, arguing that the motion was untimely and violated defendant's Fifth Amendment right against self-incrimination.

Judge Ziem ruled in favor of the prosecution and ordered the examination. Defendant, on advice of counsel, refused to talk to the psychiatrist. Following additional argument, the court ordered defendant to talk to the prosecution psychiatrist. Defendant complied.

Testimony at the trial by Lewis' mother, a psychiatric social worker and a psychiatrist, indicated that Lewis had been mistreated by his father when he was young and had developed a pattern of in-

---

[1] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974)—REPORTER.

creasingly frequent "Peeping Tom" activity, combined with masturbation. The prosecution psychiatrist, Dr. Maurice E. Willis, admitted that Lewis was unstable and mentally ill.

"*A.* The thing that makes this *man sick* is the fact that they happen with or without the stimulus. That's *why he's sick.*

\*    \*    \*

"*A.* I've already conceded he's about as *unstable* as he can be.

\*    \*    \*

"*A.* I accepted the fact, and have so stated, that this man operates for brief periods of time, *on the basis of irresistible impulses.*" (Emphasis supplied.)

Following a three-day trial, Judge Ziem found Lewis guilty of rape and gross indecency and sentenced him to a term of 15 to 40 years' imprisonment for rape, and four to five years' imprisonment for gross indecency. Defendant appealed.

After various intervening proceedings, the Court of Appeals affirmed the trial court *per curiam.* (31 Mich App 91.) We granted leave to appeal and at the same time ordered the *Lewis* case consolidated with the *Martin* case for joint submission and invited the appropriate committee of the State Bar of Michigan and other interested parties to file *amicus curiae* briefs on the following questions:

1) Whether the Michigan test for insanity in criminal cases should be changed or supplemented.

2) Whether a trial court may, upon its own motion or upon the motion of the prosecutor, order a psychiatric examination over defendant's objections to determine criminal responsibility at the time of the offense. (384 Mich 838, 839.)

I. SHOULD MICHIGAN ADOPT A NEW TEST FOR DETER-
MINING WHAT CONSTITUTES CRIMINAL INSANITY?

"It matters not how strait the gate,
How charged with punishments the scroll,
I am the master of my fate:
I am the captain of my soul."
*Invictus,* William Ernest Henley.

"There's a divinity that shapes our ends,
Rough-hew them how we will."
*Hamlet, Act V, Scene II,*
Shakespeare.

Long before psychiatry was recognized as a branch of medicine, judges, juries, lawyers, philosophers, playwrights, poets, and theologians were struggling with humanity's eternal problem—mastery of one's fate versus a fate that overwhelms and destroys. In our system of criminal law when the issue of insanity is raised, this is the critical question that must be decided in a trial by the jury or by the judge. Should Michigan adopt a new test for determining what constitutes criminal insanity? In seeking an answer to this question, the following tests have been considered:

*1. The M'Naghten Rule—Daniel M'Naghten's Case* (HL, 1843), 10 Cl Fin 200, 210 (8 Eng Rep 718, 722).
"[A]t the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

*2. People* v. *Garbutt* (1868), 17 Mich 9, 20.
" * * * that where the defense makes proof of insanity, partial or otherwise, whenever it shall be

made to appear from the evidence that prior to or at the time of the offense charged, the prisoner was not of sound mind, but was afflicted with insanity, and such affliction was the efficient cause of the act, he ought to be acquitted by the jury."

*3. The Michigan test as stated in People* v. *Durfee (1886), 62 Mich 487, 494.*

"  *  *  * whether or not he exhibited evidences which leave a reasonable doubt in your minds of the soundness of his mind in that transaction. Did he know what he was doing,—whether it was right or wrong? and if he did, then did he know or did he have the power, the will power, to resist the impulse occasioned?"

*4. The Durham "product" test—Durham* v. *United States (1954), 94 App DC 228, 241 (214 F2d 862, 874, 875).*

"  *  *  * an accused is not criminally responsible if his unlawful act was the product of mental disease or mental defect."

*5. A.L.I. Model Penal Test, § 4.01 (1962).*

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law."

*6. § 705, Proposed Michigan Revised Criminal Code (1967).*

"A person is not criminally responsible for his conduct if at the time he acts, as a result of mental disease or defect, he lacks capacity to conform his conduct to the requirements of law."

In 1843, the English House of Lords formulated a rule to fix criminal responsibility in England that

has come to be known as the *M'Naghten Rule*—or the right from wrong test. In many American jurisdictions, this test was adopted with modifications.[2]

In *People* v. *Garbutt, supra,* defendant was charged with the crime of murder in the first degree. Defense counsel requested the judge to charge " * * * where the defense makes proof of insanity, partial or otherwise, whenever it shall be made to appear from the evidence that prior to or at the time of the offense charged, the prisoner was not of sound mind, but was afflicted with insanity, and such affliction was the efficient cause of the act, he ought to be acquitted by the jury". (P 20.) The charge was refused and such refusal was claimed to be error on appeal. Chief Justice COOLEY, writing for this Court, stated:

"But it is claimed that the recorder erred when he declined to charge that, if it appeared from the evidence that defendant was afflicted with insanity, and such affliction was the efficient cause of the act, he ought to be acquitted by the jury. This refusal, however, must be considered in connection with the charge actually given, and we are not satisfied that other portions of the charge do not fully cover this ground. * * * If we do not misapprehend the charge, the view of the recorder seems to have been substantially the same as our own." (Pp 23, 24.)

Earlier in his opinion, Chief Justice COOLEY had stated, " * * * there can be no criminal intent when the mental condition of the party accused is such that he is incapable of forming one". (P 21.)

Although *Garbutt* has been cited frequently in subsequent cases, it has not been used as authority

---

[2] No extended discussion or analysis of the various tests will be undertaken in this opinion. For an excellent presentation of the same, see Abraham S. Goldstein, *The Insanity Defense* (1967), Library of Congress catalog card No. 67–24863, available in Yale University Press paperback.

for the sanity test. In *People* v. *Krugman* (1966), 377 Mich 559, 562, this Court did invite further inquiry into the *Garbutt* proposed sanity test. However, this Court has never approved or adopted the test.

In 1886, in *People* v. *Durfee, supra,* this Court adopted the so-called Michigan rule which has come by a sort of shorthand to be identified as *M'Naghten* plus "irresistible impulse". This is unfortunate. A careful reading of the test in *People* v. *Durfee* will reveal that nowhere in the language of that test does there appear the word "irresistible".

The salient elements of the Michigan test[3] are: 1) whether defendant knew what he was doing was right or wrong; and 2) if he did, did he have the power, the will power, to resist doing the wrongful act? The Michigan test encompasses not only a sudden overpowering, irresistible impulse but any situation or condition in which the power, "the will power" to resist, is insufficient to restrain commission of the wrongful act.

A prodigious amount of thought, study and labor has gone into the formulation of the *Durham*, A.L.I., and proposed Michigan Revised Criminal Code tests.[4] Each has its merits. If we were to write

---

[3] Curiously enough, there is little discussion of *Durfee* in Michigan cases. For cases in which the issue of insanity is discussed, see: *People* v. *Finley* (1878), 38 Mich 482; *People* v. *Cummins* (1882), 47 Mich 334; *People* v. *Holmes* (1896), 111 Mich 364; *People* v. *Quimby* (1903), 134 Mich 625; *People* v. *Bowen* (1911), 165 Mich 231; *People* v. *Sharac* (1920), 209 Mich 249; *People* v. *Williams* (1922), 218 Mich 697; *People* v. *Wingeart* (1963), 371 Mich 264; *People* v. *Wright* (1970), 25 Mich App 499; *People* v. *Martin* (1970), 28 Mich App 633; *People* v. *J. C. Lewis, Jr.* (1971), 31 Mich App 91; *People* v. *Getterson* (1971), 31 Mich App 124.

[4] "Michigan courts have, therefore, routinely applied a statement of law in which factors of mental disease or abnormality and its causal relationship with the acts giving rise to the criminal charge are controlling, and in which there is a minimum of judgmental terms like 'nature', 'quality', 'right' or 'wrong'.

\*      \*      \*

upon a clean slate, we might well decide to adopt one of them. There are a number of reasons why we do not do so.

1. The Michigan test is well understood by Michigan judges.[5] With proper amplification and explanation by the trial judge to the jury, depending upon the facts of the particular case, we consider it wholly adequate and fair.[6] It is sufficiently broad

---

"*The text of Section 705 does not in any significant way change the substance or operation of long-established Michigan case law; all that it does is to utilize a more contemporary terminology.*" (Emphasis added.) Committee Commentary on Proposed Michigan Revised Criminal Code, § 705 (1967), p 73.

[5] While we have heretofore quoted what is generally regarded as the *Durfee* test, it is important to remember the entire instruction of the trial judge in *Durfee* as to insanity which received the unqualified approval of this Court. It reads (pp 493, 494):

" 'It must appear in this case that the defendant is a man of sound mind. Now, by "sound mind" is not meant a mind which is the equal of any mind possessed by any mortal in the world. We all know that there is a difference in the minds of our acquaintances. Some men are very bright, others are very dull; but they are held accountable. Perhaps it would be enough to say—and to leave it right here—that if, by reason of disease, the defendant was not capable of knowing he was doing wrong in the particular act, or if he had not the power to resist the impulse to do the act by reason of disease or insanity, that would be an unsound mind. But it must be an unsoundness which affected the act in question, and not one which did not affect it. There is a simple question for you.

" 'You have heard the evidence in the case, you know what the circumstances are, and you can judge from all the evidence in the case—including the transaction itself, and his conduct at the time—whether or not he exhibited evidences which leave a reasonable doubt in your minds of the soundness of his mind in that transaction. Did he know what he was doing,—whether it was right or wrong? and if he did, then did he know or did he have the power, the will power, to resist the impulse occasioned? You are not to draw the inference because a man acts frantically mad and angry, very angry, that he does not resist the impulse,—that that is unsoundness of mind.

" 'This unsoundness must be the result of a disease, and not the result of his having allowed his passions to run until they have become uncontrollable. We frequently meet men in courts of justice who claim that they have committed a crime because they were drunk. The law holds them responsible, because they should not have got drunk; they should not have formed the habit. So the law requires of a man that he will curb his passions and restrain himself, and, if he does not do it, holds him accountable, unless it is by reason of disease which renders him unable to do it.' "

[6] See the jury instructions on the question of insanity in *People v. Quimby* (1903), 134 Mich 625, in which case the *Durfee* test was

in scope so as to allow competent psychiatric testimony on all facts of a defendant's history.

2. The chief criticism of the Michigan test has been that psychiatrists are unable to accommodate *their* concepts and evaluations of human conduct to the standards of the test. We do not regard this as a valid criticism. Psychiatry has been and is now in a constant state of evolvement and reevaluation.[7] As of the present time, in any trial in

given. A portion of the amplified instruction of the trial judge and this Court's comment is as follows:

" 'In determining this question, consider carefully all the facts bearing in any manner upon it. Did she inherit insanity from her ancestors? If so, what was the nature of such insanity? What has been her life and habits and surroundings, as disclosed by the evidence? What has been her physical condition, and how has that been affected by her life and habits? Consider what her friends and neighbors have discovered in regard to her actions as tending to show whether or not she is sane or insane. Consider the testimony of the doctors who have examined her, and their opinions on the subject. What oportunity did the doctors have to obtain knowledge upon which to base an opinion? Consider carefully her actions just before and at the time of the committing of the crime. Did she do any act preparatory for the committing of the crime? If so, look carefully to see what it was. How was it committed? Did she make a statement in writing during that Sunday night? If so, look into it. Does it indicate that she was at that time irresponsible, or does it indicate to the contrary? Consider her statements the next morning, if she made any, and all her statements and conduct since her arrest, so far as they are disclosed by the evidence; and from all these, and any other evidence that I have not referred to touching the question, determine whether or not on that Sunday night the respondent was such a woman as should be held responsible for the crime with which she is charged.'

"We do not think the jury had any difficulty in understanding the meaning of the court." (Pp 637, 638.)

[7] More than 100 years ago, in *People* v. *Garbutt* (1868), 17 Mich 9, 16, 17, it was stated:

"Mental disease is itself so various in character * * * that the most experienced experts are sometimes obliged to confess that, however careful and thorough their investigations, they still prove unsatisfactory, * * * . This fact is very forcibly brought home to us by the conflicting views expressed on criminal trials by careful, experienced and conscientious medical experts, who, regarding the same state of facts in the light of their scientific investigations and actual but diverse experience, are forced to express differing views, in consequence of which juries, in these difficult cases, are sometimes left in a state of greater doubt and difficulty, if possible, than if no such evidence had been given."

which the issue of insanity is raised, there is almost certain to be wholly conflicting testimony by psychiatrists with regard to that issue. With all due deference for the achievements in this field of human medicine, we do not believe that medical knowledge has reached that state of certainty which permits it to determine what the law should be.

It has been stated that "the most vociferous complaint of the psychiatrists about *M'Naghten* was that the rule forced them into the impossible position of making a moral judgment". Edward De Grazia, *The Distinction of Being Mad,* 22 U Chi L Rev 339, 347 (1955). However, "the matter of criminal responsibility (whether it be predicated initially upon 'mental disease' or ignorance of 'right' and 'wrong') *is* a moral matter". (*Supra,* pp 347, 348.) "The problem is to differentiate between the wholly non-deterrable and persons who are more or less susceptible to influence by law." Herbert Wechsler,

---

In *People* v. *Beverly* (1896), 108 Mich 509, 512, it was observed: "Insanity is not only a broad, but a very flexible, term, and men differ in their conception of it."

Recently, in *People* v. *Wingeart* (1963), 371 Mich 264, 275, Justice SOURIS, in his dissenting opinion, recognized the *Garbutt* statement quoted above and stated: "Our current reports reflect the continuing expression by psychiatric witnesses of conflicting views of criminal defendants' sanity notwithstanding their presumptively increased knowledge of diseases of the mind."

In an article, *On the Justifications for Civil Commitment,* Joseph M. Livermore, Carl P. Malmquist, Paul E. Meehl, 117 U Pa L Rev 75–96 (1968–1969), it was stated: "One need only glance at the diagnostic manual of the American Psychiatric Association to learn what an elastic concept mental illness is. * * * Obviously, the definition of mental illness is left largely to the user and is dependent upon the norms of adjustment that he employs. * * * The usual reason for variance in diagnosis is a variance in the theoretical orientation of the diagnosticians." (P 80.)

In *Martin,* presently before us, four psychiatrists were called to testify, three representing the state and one representing defendant. The three psychiatrists who actually examined defendant agreed Martin had a "personality disorder". Each psychiatrist classified the disorder differently and varied also on whether or not their diagnosis meant actual mental illness. Only one psychiatrist felt Martin did not know the difference between right and wrong and was operating under an impulse.

*The Criteria of Criminal Responsibility,* 22 U Chi L Rev 367, 374 (1955). Thus, the issue of criminal insanity must be a jury question.

As was stated in *People* v. *Finley* (1878), 38 Mich 482, 483:

"The law has no theories on the subject of insanity. It holds every one responsible who is *compos mentis,* or a free agent, and every one irresponsible who is *non compos mentis,* or not having control of his mind. * * * If the term 'insanity'—which it may be remarked is not a term of the law at all— is so far enlarged as to include persons who have not only knowledge of wrong but also capacity to resist it, then it includes persons whom the law deems capable of crime, and is a phrase entirely inapplicable in civil or criminal law."

It should never be forgotten that it is the jury (or the judge if a jury is waived) who is the ultimate trier of the fact of criminal insanity. In most cases, the expert knowledge of psychiatrists can be of assistance to the jury or judge in arriving at their determination, but under our system of justice that ultimate determination rests with the court or a defendant's jury of his peers.

3. In *People* v. *Cole* (1969), 382 Mich 695, this Court dealt with the problem of advising a jury as to the disposition of a defendant found not guilty by reason of insanity. Prior to that decision, a jury knew what disposition would result to a defendant found guilty and what disposition would result from a finding of not guilty. It was uninformed as to what disposition would result from a finding of not guilty by reason of insanity. In *Cole,* it was abundantly clear that the jury found defendant guilty, not because it considered him to be guilty, but rather because it considered it essential that he be confined in view of the senseless kill-

ing he had committed. This deficiency in our law has been remedied by the decision in *Cole.* Juries need no longer be left groping in the dark as to what will happen to a defendant found to be criminally insane. Guided by knowledge of the result of their verdict and the Michigan test of criminal insanity, they will now be in a much better position to arrive at a fair and just verdict.

4. Finally, for a number of years and at the present time, the Michigan legislature has had under consideration a revision of the Criminal Code. While this Court has the power to adopt a new test for determining what constitutes criminal insanity, in deference to the legislature we decline to take such action at the present time.[8]

---

[8] Professor Goldstein, in his book, *The Insanity Defense, supra,* has summed up the arguments for a new test as follows:

"Nevertheless, the words in which the defense should be cast are still receiving far more attention than they deserve. But what is now at work is a tidying-up process. Though the debate still centers on whether *M'Naghten* should be discarded, whether the 'control' tests are adequate, whether *Durham* or the ALI rule should be adopted, the discussions have begun to change their form. It is slowly becoming clear that the words of the test are a small part of a process which includes, in addition, the testimony of laymen and experts, examination and cross-examination, argument and counter-argument. The significance of any one of the competing formulae turns on whether one formula leads a trial judge to admit more evidence than another, or experts to testify more usefully, or juries to acquit or convict more persons.

"Measured by these standards, the various tests do not seem very different. As matters now stand, identical evidence may be admitted under each of them and juries tend to assign much the same meaning to them. Even when the words themselves are regarded as different, they come to the jury as part of a process of proof and argument which shapes the words to the particular case. I do not intend to minimize the difficulties which have followed from misunderstanding of either *M'Naghten* or of the 'control' tests, or to suggest there is no need to follow the ALI in combining and improving upon them. The point, rather, is that reform of the insanity tests will have surprisingly modest results. In any event, before very long, defendants and their counsel will become aware of the opportunities available to them under the older rules. Both *M'Naghten* and the 'control' tests will probably be construed more liberally than in the past, as the judiciary finds such courses preferable to adoption of a new rule. (Pp 213, 214.)

II. Other Issues in Martin

As for defendant's claims that the circuit court lacked jurisdiction over him (1) because the waiver of extradition which he signed was invalid for failing to advise him of the crime charged, (2) because he signed it before a Michigan warrant had been issued for his arrest, and (3) because the waiver failed fully to comport with Indiana statutory requirements, Michigan law requires that a waiver of extradition (from Michigan) be executed before a judge and only after a defendant has been advised of his right to challenge the extradition. (MCLA § 780.25 [Stat Ann 1954 Rev § 28.1285(25)]). Indiana law contains no such requirement. Both Federal and Michigan cases uphold the power of a court to try a defendant regardless of the means used to bring him within the court's jurisdiction. *Ker* v. *Illinois* (1886), 119 US 436 (7 S Ct 225, 30 L Ed 421); *Lascelles* v. *Georgia* (1893), 148 US 537 (13 S Ct 687, 37 L Ed 549); *Frisbie* v. *Collins* (1952), 342 US 519 (72 S Ct 509, 96 L Ed 541), *reh den* (1952), 343 US 937 (72 S Ct 768, 96 L Ed 1344); *In re Little* (1902), 129 Mich 454; *People* v. *Mahler* (1950), 329 Mich 155, *cert den* (1951), 340 US 949 (71 S Ct 529, 95 L Ed 684), *cert den* (1953), 345 US 943 (73 S Ct 837, 97 L Ed 1369).

As for defendants' claim that the trial court erred in refusing defendant's request that Dr. Ames Robey be sequestered, requests to sequester should ordinarily be granted. *People* v. *Hall* (1882), 48 Mich 482, 487. However, our cases also hold that sequestration of witnesses is a matter for the discretion of the trial court. See, for example, *People* v. *Burns* (1887), 67 Mich 537, 538; *People* v. *Ring* (1934), 267 Mich 657, 659. On the facts in this case, refusal to sequester Dr. Robey, a rebuttal expert witness, was not an abuse of the trial court's

discretion. Also the trial court did not abuse its discretion by permitting indorsement, on the first day of trial, of Dr. Robey as a witness. 1 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 342, pp 411, 412; *People* v. *Bauer* (1921), 216 Mich 659, 662.

### III. MAY A TRIAL COURT ORDER A PSYCHIATRIC EXAMINATION BY THE PROSECUTION OF A DEFENDANT WHO HAS OFFERED A DEFENSE OF INSANITY?

Trial courts have the duty to order a forensic psychiatric examination "upon a showing that the defendant may be incompetent to stand trial". (MCLA § 767.27a[3] [Stat Ann 1971 Cum Supp § 28.966(11)(3)]). However, MCLA § 767.27a(4) (Stat Ann 1971 Cum Supp § 28.966[11][4]), provides that:

"The diagnostic report and recommendations shall be admissible as evidence in the hearing, but not for any other purpose in the pending criminal proceedings."

We conclude that a psychiatrist who conducts such a forensic psychiatric examination may not be called to testify in the criminal trial if there is an objection to the admission of such testimony by defendant.

MCLA § 768.20 (Stat Ann 1954 Rev § 28.1043), requires filing of a notice of intention to claim the defense of insanity. Defendant is required to inform the state as to the exact names and addresses of defendant's proposed witnesses. The witnesses defendant may call to support such a defense are limited to those stated in the notice.

In the light of our recent decision in *People* v. *Cole, supra,* if the people are unable to obtain a psychiatric evaluation of defendant, a plea of not

guilty by reason of insanity would practically compel a verdict of not guilty by reason of insanity since the people would have no means of meeting and overcoming this affirmative defense. In the present case of *Lewis,* counsel for defendant candidly admits in his brief: "Absent the testimony of Doctor Willis, the court appointed psychiatrist, Judge Ziem would have had no alternative but to find defendant not guilty by reason of insanity."

The Florida Supreme Court has analyzed the problem in this fashion in *Parkin* v. *State* (Fla, 1970), 238 So 2d 817, 821:

"Self-incrimination is not directly an issue in cases such as this, simply because the question to be resolved is not guilt or innocence, but the presence or absence of mental illness. Illness, particularly mental illness, although often capable of being proved by extrinsic evidence, is considered more susceptible to proof by evidence based on interviews with the defendant and requiring his cooperation. For this reason, a court before whom an insanity plea is entered is empowered to appoint experts to examine the defendant, and to arrange for examination by these experts.

\*          \*          \*

" \* \* \* the defendant having raised the issue of possible insanity, as distinguished from guilt or innocence, must be expected to help resolve it with greatest accuracy. Like the decision to testify in one's behalf and risk incrimination during cross-examination, the decision to plead insanity and tender proof is not a pathway without stones."[9]

---

[9] A majority of American jurisdictions are of this view. See, for example, *State* v. *Whitlow* (1965), 45 NJ 3 (210 A2d 763); *Lee* v. *County Court of Erie County* (1971), 27 NY2d 432 (318 NYS2d 705); *United States* v. *Weiser* (CA2 1969), 428 F2d 932; *Pope* v. *United States* (CA8, 1967), 372 F2d 710; *Alexander* v. *United States* (CA8, 1967), 380 F2d 33.

Counterposed to this is the position taken by the Colorado Supreme Court in *French* v. *District Court* (1963), 153 Colo 10, 14 (384 P2d 268, 270):

"A person accused of a crime who enters a plea of not guilty by reason of insanity, cannot be compelled to carry on conversations against his will under the penalty of forfeiture of the defense for failure to respond to questions, or for a refusal to 'co-operate' with persons appointed to examine him. The statute which prescribes the procedures to be followed upon the entry of a plea of not guilty by reason of insanity cannot operate to destroy the constitutional safeguards against self-incrimination."[10]

A plea of not guilty by reason of insanity is not a plea that incriminates. It is just the opposite. It is a special plea in avoidance of the guilty charge. It places in issue subjective factors of an individual's emotions and mind which, in the usual situation, as pointed out in *Cole, supra,* can only be probed and evaluated by a medical expert. May a defendant who is permitted such a plea submit himself to his own experts for evaluation and analysis and yet deny the people the same source of information?

In *United States* v. *Albright* (CA4, 1968), 388 F2d 719, the Court reasoned (p 723):

"Explicit in *Pope* v. *United States, supra,* and implicit in *Winn* v. *United States,* [(1959), 106 App DC 133 (270 F2d 326)] is the ruling that a defendant's right not to incriminate himself is not violated *per se* by requiring him, in an appropriate case,

---

[10] For the minority view, see *Johnson* v. *People* (1970), 172 Colo 72 (470 P2d 37); *State* v. *Olson* (1966), 274 Minn 225 (143 NW2d 69); *People* v. *English* (1964), 31 Ill 2d 301 (201 NE2d 455); *People* v. *Combes* (1961), 56 Cal 2d 135 (14 Cal Rptr 4, 363 P2d 4); *McGuire* v. *Superior Court, County of Los Angeles* (1969), 274 Cal App 2d 583 (79 Cal Rptr 155).

to submit to a mental examination. We adopt the rule in this circuit on the authority of those cases and the following considerations:

"The manifest purpose of the examination in this case was, and the proper objective of a mental examination in any criminal case where a defendant's sanity is in issue should be, to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case. *Cf. United States* v. *Wade,* 388 U.S. 218, 219, 222, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). The purpose is not to prove by evidence wrested from a defendant whether he is guilty as charged but, rather, to prove whether a defendant possesses the requisite mentality to be guilty as charged, assuming that his guilt is otherwise established, or whether, legally, he cannot be held criminally responsible, irrespective of what other proof may establish he has done. The 'testimonial' or 'communicative' test of what is and what is not within the privilege against self-incrimination, invoked in *Schmerber* v. *State of California,* 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), is not an appropriate distinction to be applied in the case at bar, but that test is not absolute because, as stated in *Schmerber,* it is only 'a helpful framework for analysis,' and '[T]here will be many cases in which such a distinction is not readily drawn.' "

We adopt the reasoning of the Court in *Albright* and hold that when a defendant pleads not guilty by reason of insanity, he must submit himself to examination by the people's experts as ordered by the trial court "to obtain knowledge not about facts concerning defendant's participation in the criminal acts charged, but about facts concerning a defendant which are themselves material to the case".

There remains the question of the procedure to be followed upon the entry of notice of a plea of

not guilty by reason of insanity. Prior to trial, an appropriate motion should be made to the court by the people requesting such an examination if one is desired. In this case of *Lewis,* the examination was not requested until the trial had commenced. In the absence of a procedural guideline, we do not regard the order of the trial judge as erroneous. The timing of the examination is primarily in the interests of an orderly proceeding.

The question of right to have counsel present at the psychiatric examination has also been raised. The purpose of the examination is to afford the people the same opportunity to evaluate defendant's condition as was afforded by defendant to his experts. Counsel need not be permitted to be present if, in the opinion of the psychiatrist, counsel's presence would tend to thwart or interfere with the examination. This is not to say that in a particular case a judge may not order that counsel for a defendant be present or require that a recording be made of any interviews with a psychiatrist. These are matters better left to the sound discretion of the trial judge. Basically it is assumed that, in the search for truth, a psychiatrist should be able to pursue his methodology unfettered and that the traditional methods of cross-examination will enable the judge or jury critically to scrutinize all results obtained.

In both the case of *People* v. *Martin,* and the case of *People* v. *J. C. Lewis, Jr.,* the Court of Appeals and the trial court are affirmed.

T. M. KAVANAGH, C. J., and BLACK, T. E. BRENNAN, SWAINSON, and WILLIAMS, JJ., concurred with ADAMS, J.

T. G. KAVANAGH, J., concurred in the result.