# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## PEOPLE v LEFFEW

Docket Nos. 161797 and 161805. Argued on application for leave to appeal November 9, 2021. Decided January 26, 2022.

Jeremiah J. Leffew and his wife, Micheline N. Leffew, were convicted following a jury trial in the Arenac Circuit Court of first-degree home invasion and third-degree home invasion, respectively. Defendants went to the home of Michael Porter with Jeremiah's mother, Donna Knezevich, to pick up Lisa Seibert, Knezevich's partner. Seibert had been staying with Porter following an argument between Seibert and Knezevich, but the two had reconciled and Seibert had asked to be picked up and driven home. When defendants and Knezevich arrived at Porter's residence, Porter briefly answered the door before closing it; Seibert did not leave. Defendants and Porter disagreed as to whether Porter had prevented Seibert from leaving the home. Defendants testified that Porter had dragged Seibert into a room in the back of the home and forcibly held her down in a chair, while Porter claimed that he had picked Seibert up and put her in a chair to help her get her bearings after she had become unsteady on her feet. Both defendants testified that they heard Seibert scream for help and that they had then entered the home without Porter's permission. Micheline had entered the home first after kicking in the back door, and she was immediately hit over the head with a glass ashtray by Porter, causing bleeding and a seizure. Jeremiah entered the home after seeing his injured wife on the floor and got into a physical altercation with Porter. The fight eventually ended when, according to Jeremiah, he threatened Porter with a knife while pleading with him to let his family go; or, according to Porter, the fight ended when Knezevich called out to Jeremiah, after Jeremiah had struck Porter with a knife and cut Porter's wrist. Defendants' attorneys both argued that defendants' intrusions into Porter's home were justified because of their reasonable fear that Seibert was in imminent danger, but neither attorney requested a jury instruction on defense of others. Defendants appealed, and the Court of Appeals consolidated defendants' cases. The Court of Appeals, BOONSTRA, P.J., and TUKEL, J. (LETICA, J., concurring in part and dissenting in part), affirmed defendants' convictions. Defendants sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the applications or take other action. The Supreme Court directed the parties to file supplemental briefs addressing whether the defense-of-others justification was applicable to defendants' charges and whether the defense attorneys were ineffective for failing to request an instruction on defense of others. 506 Mich 1031 (2020).

In a unanimous opinion by Chief Justice MCCORMACK, the Supreme Court, in lieu of granting leave to appeal, *held* :

Defendants were prejudiced and received ineffective assistance of counsel when their attorneys failed to request a jury instruction on the defense of others, and defendants were entitled to a new trial.

1. Under the defense-of-others doctrine, a person may use force in defense of another when they reasonably believe that the other is in immediate danger of harm and force is necessary to prevent the harm; deadly force is permissible to repel an attack that reasonably appears deadly. Although the Court of Appeals expressed skepticism that defense of others, which was traditionally used to excuse assaultive conduct, was available as a defense to a nonassaultive offense, Michigan courts have recognized the application of defense of others to nonassaultive crimes, including in *People v Dupree*, 486 Mich 693 (2010). *Dupree* held that self-defense was applicable to the nonassaultive offense of being a felon in possession of a firearm. The Court of Appeals distinguished *Dupree* on the basis that it was decided before the effective date of the Self-Defense Act (SDA), MCL 780.971 *et seq*. But this analysis misread *Dupree* and the SDA. The act expanded the ability to invoke the affirmative defenses of self-defense and defense of others. Section 4 of the act, MCL 780.974, specifically preserves the common-law right of an individual to use force in self-defense or in defense of another person, and § 2, MCL 780.792, removes the traditional common-law duty to retreat so long as the person asserting the affirmative defense was not committing a crime and had the legal right to be where they were when they used force. Although § 2 could appear to preclude defendants' rights to assert defense of others because they entered Porter's home without his permission, § 2 was not relevant here because it is a statutory precondition to standing one's ground under the SDA, which is a right that defendants did not invoke. The applicability of defense of others must be determined on the particular facts of each case, not on the charges brought by the prosecution, and defense of others was available in this case to defendants in response to the nonassaultive home-invasion charges.

2. Criminal defendants have the constitutional right to present a defense, and instructional errors that directly affect a defendant's theory of defense can infringe upon this right. However, an affirmative-defense instruction is not automatically given upon request, and a defendant has the burden of producing some evidence from which the jury could conclude that the essential elements of the defense are present. The defendant's burden is not heavy, and an instruction on the theory of defense must be given even when the evidence presented by the defendant in support of the theory is weak or of doubtful credibility. In this case, defendants put forward "some evidence" that they reasonably believed their entry into Porter's home was necessary to prevent harm to Seibert, and Jeremiah testified that he also acted to protect his wife after she entered the home and was injured by Porter. Indeed, defendants' trial strategy turned on a defense-of-others theory, and attorneys for both defendants presented evidence and arguments leading the jury toward an acquittal under a defense-of-others theory but then failed to request an instruction in support of the theory. The failure of the attorneys to request the instruction was objectively unreasonable.

3. Error does not result from the omission of a jury instruction as long as the instructions as a whole cover the substance of the missing instruction. Micheline's jury was instructed that it could only convict her if it found that she had destroyed Porter's property "knowing that it was wrong, without just cause or excuse." The Court of Appeals concluded that the lack of a defense-

of-others instruction did not prejudice Micheline because the verdict indicated that the jury rejected the theory that she was justified in her actions and a defense-of-others instruction would not have altered the jury's conclusion. However, if defense counsel had requested a defense-of-others instruction, the trial court would have explained to the jury, in part, that if Micheline had acted in lawful defense of others, her actions were justified and she was not guilty of home invasion. Further, the "without just cause or excuse" language in the instruction for malicious destruction of property offered no guidance about what constituted "just cause or excuse" and was inadequate to explain why Micheline's conduct could be excused. The defense-of-others instruction would have explained to the jury that the circumstances described by Micheline were defined as just cause under the law, and the jury could then have decided whether the prosecution proved beyond a reasonable doubt that Micheline's belief that her conduct was necessary to protect Seibert was not reasonable. A defense-of-others instruction also would have provided jurors a framework for how to judge Micheline's conduct given the differing accounts of the incident. Specifically, the instruction would have explained that the jury could consider how the circumstances had appeared to Micheline at the time of the incident and that as long as her belief was reasonable and honest, it did not matter if Seibert had not, in fact, been facing imminent, unlawful force. There was a reasonable probability that the jurors concluded that Seibert was not in imminent danger without understanding that what was important was Micheline's perspective. Similarly, the instructions given to Jeremiah's jury for first-degree home invasion and felonious assault did not inform the jury that the law excused Jeremiah's conduct if he reasonably and honestly believed that Seibert or Micheline was in danger. This omission was prejudicial, and moreover, Jeremiah conceded the elements of the home-invasion charge on the basis of his argument that he was acting to protect others. If the jury had been told that the law supported his defense, a different outcome was reasonably probable.

4. The Court of Appeals improperly concluded that defense of others was not available to Jeremiah because he was the initial aggressor. To reach this conclusion, the Court of Appeals credited Porter's testimony over Jeremiah's, which was a question for the jury to decide. The relevant question was whether Jeremiah had put forward "some evidence" that he had acted in defense of others and was not the initial aggressor. Given Jeremiah's claim that he had acted to defend Micheline after Porter smashed an ashtray on her head, the jury could have considered Porter's conduct to be the initial act of aggression. Regarding the felonious-assault charge, whether Jeremiah reasonably and honestly believed that his wife was in imminent danger when he gained possession of the knife presented a closer question. But Jeremiah's testimony that he had picked up the knife and pleaded with Porter to let them go, after observing his severely injured wife, could have allowed a jury to find that he reasonably and honestly believed that he needed to use force to protect Micheline.

5. As with the home-invasion charge, Jeremiah conceded the elements of felonious assault but claimed that he took these actions to defend Seibert and Micheline. The lack of a defense-of-others instruction denied the jury an avenue to an acquittal because it was not informed that the law excused Jeremiah's conduct if his belief that his loved ones were in danger was honest and reasonable. Therefore, Jeremiah was prejudiced by his attorney's failure to request a defense-of-others instruction for his felonious-assault charge.

Reversed and remanded for a new trial.

**OPINION**

Chief Justice:
  Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED  January 26, 2022

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee,

v                                                                              No. 161797

MICHELINE NICOLE LEFFEW,

Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN

Plaintiff-Appellee,

v                                                                              No. 161805

JEREMIAH JAMES LEFFEW,

Defendant-Appellant.

BEFORE THE ENTIRE BENCH

MCCORMACK, C.J.

An Arenac County jury convicted Jeremiah and Micheline Leffew of first-degree and third-degree home invasion, respectively. Jeremiah was also convicted of felonious assault. Jeremiah and Micheline believe that the court should have instructed their jury on the defense of others and that their attorneys' failure to request the instruction deprived them of their Sixth Amendment right to effective assistance of counsel, US Const, Am VI; Const 1963, art 1, § 20. We agree. We reverse the judgment of the Court of Appeals and remand for a new trial.

## I. FACTS AND PROCEDURAL HISTORY

In September 2017, Jeremiah Leffew and his wife, Micheline Leffew, moved to Michigan, where they stayed with Jeremiah's biological mother, Donna Knezevich, and her partner of more than 25 years, Lisa Seibert. A few months before Micheline's and Jeremiah's arrival, Seibert and Knezevich had opened their relationship to include Michael Porter.

On November 14, 2017, Knezevich and Seibert argued. Seibert would later describe it as a "little squabble" that got "pretty heated." Police arrived, and Seibert, on Knezevich's insistence, left the family home and stayed with Porter. A few days later, though, tempers cooled and Knezevich sought to reconcile. She called Seibert, who was still staying at Porter's home, and proposed marriage. Seibert accepted and asked Knezevich to pick her up. Knezevich, happy to oblige, went to Porter's house, accompanied by Jeremiah and Micheline.

Jeremiah drove. He pulled into Porter's driveway, honked the horn twice, and waited for Seibert to emerge. But she did not. Meanwhile, inside the home, Porter called

2

911 when he recognized Jeremiah's vehicle in his driveway. He would later testify that he called 911 because Jeremiah had recently lunged at him with a knife, and he had hoped to defuse the situation.

At this point, the facts diverge.

### A. MICHELINE'S AND JEREMIAH'S ACCOUNTS

Jeremiah and Micheline testified that after waiting for several minutes for Seibert to emerge from the house, they walked to the front door with Knezevich. Micheline knocked. Porter answered. Seibert stood behind him, putting on her coat and gathering her sunglasses. Micheline told Porter that they were there to pick up Seibert. Micheline asked Seibert if she wanted to leave and Seibert said, "Yes." Micheline recalled Porter saying, "Give me a few minutes," while Jeremiah recalled Porter saying, "Lisa's not coming." Micheline and Jeremiah agree that Porter then slammed the door shut.

Moments later, Jeremiah and Micheline—looking through the large window next to the front door—watched as Porter grabbed Seibert by her shoulders and dragged her into the back room of the home. Jeremiah testified that he saw Seibert momentarily break free, only for Porter to grab her and throw her to the floor. Micheline and Jeremiah both said Porter pushed Seibert down into a chair, and Seibert cried out for help.

Upon hearing Seibert's scream, Micheline and Jeremiah ran to the back of the house, where there was both a sliding glass door and a separate backdoor. Jeremiah looked through the sliding glass door, where he saw Porter forcibly holding Seibert in a chair as she screamed. Jeremiah was screaming, too, yelling at Porter to stop harming his stepmother. Then, a loud bang rang out. Micheline had kicked down the back door to

3

rescue Seibert. But the moment she stepped into Porter's home, Porter smashed a heavy glass ashtray over her head, knocking her to the ground and triggering a seizure. Jeremiah, following the sounds of commotion, went to the kicked-down door, where he saw his wife lying facedown, bleeding, and having a seizure. A shocked Jeremiah did not have time to process the scene, though, because Porter began punching him as soon as he reached the backdoor threshold. Jeremiah saw a kitchen knife on the nearby counter. He grabbed it, held it threateningly, and asked Porter to leave his family alone and let them go. Porter backed down, Jeremiah set down the knife, helped his wife out of the home, and drove his family to the hospital.

## B. PORTER'S ACCOUNT

Porter recalls things differently. Porter testified that only Micheline and Knezevich came to his front door. Porter asked for 5 to 10 minutes so he could speak with Seibert and find out what was going on. He closed the door and locked it. By that point, Jeremiah had made his way to the back of the house and was beating on Porter's patio window, threatening to kill Porter. At about the same time, Seibert had slumped against a door, and was slowly sliding down it. Porter took her by the hands, picked her up, and sat her down in the dining room to help her get her bearings. Within seconds, both Micheline and Jeremiah were beating on the back door and kicking it. Porter watched as the bottom of his back door began to give way. He again dialed 911.

A moment later, the back door blew open. From the corner of his eye, Porter saw someone entering his home. Fearing for his life, he picked up an ashtray and smashed it on the intruder's head. Micheline fell to the floor. Jeremiah, only a step behind, then

4

entered the home and began attacking Porter. Porter fought back, and as he did, Micheline rejoined the fray, jumping on his back, knocking him over against the sink, and shouting "Let's kill him, let's kill him." Jeremiah rifled through the kitchen drawers, found a steak knife and tried to stab Porter, cutting his wrist and knocking a diamond out of his watch. The fight ended only after Knezevich called out to her son. Jeremiah, knife still in hand, exited through the front door with his wife.

## C. SEIBERT'S ACCOUNT

Seibert testified that when Jeremiah and Micheline came to the front door, "[t]hey were kind of giving [Porter] a hard time, and Micheline slapped him" as Porter repeatedly insisted that he just needed a few minutes. After Porter finally closed the front door, both she and Porter were afraid that things would escalate. She sat down in a chair and Porter stood in front of her. At that point, Jeremiah and Micheline were "beating the backdoor in" as Porter dialed 911 for a second time. Seibert heard the back door get kicked in, and she ran to the front door because "they were telling me to run." At some later point, Micheline—incoherent and with blood on her face—and Jeremiah exited out the front door.

On cross-examination, defense counsel impeached Seibert with her police statement and her preliminary-examination testimony. In her statement, she wrote that when Micheline and Jeremiah were on Porter's front porch, she had "tr[i]ed to go out the front door," but Porter "pushed me to the floor and the[n] got me up and pushed [me] in the chair and kept me there[,] he wouldn't let me get up." Seibert had also told police that Porter "grabbed me and pushed me in the dining room and held me there" and that Porter "kept me there [and] he wouldn't let me get up." At the preliminary examination, she testified

5

that Porter told her she could not leave, prevented her from exiting the home by pushing her away as she placed her hand on the doorknob, and knocked her to the floor. When presented with this impeachment evidence, Seibert insisted that Porter had never intentionally harmed her.

## D. CRIMINAL PROCEEDINGS

Following a joint two-day jury trial, the jury convicted Micheline of third-degree home invasion based on her commission of a misdemeanor (malicious destruction of a building) while breaking into the home and Jeremiah of first-degree home invasion based on entering the home without permission and committing an assault against Porter. Jeremiah was also convicted of felonious assault. Though defense counsel argued that Micheline's and Jeremiah's intrusion into Porter's home was justified because of their reasonable fear that Seibert was in imminent danger, they never requested a defense-of-others instruction; as a result, the jury wasn't told that the law allowed Jeremiah's and Micheline's defense. Micheline was sentenced to five months in jail and two years' probation. Jeremiah, as a third-offense habitual offender, was sentenced to concurrent terms of 25 to 40 years for home invasion and 2 to 8 years for felonious assault.

Following an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), and the trial court's denial of a new trial on an issue unrelated to this appeal, the Court of Appeals consolidated the defendants' cases. The panel issued an unpublished opinion that affirmed both defendants' convictions, with a partial dissent related to the length of Jeremiah's sentence. *People v Leffew*, unpublished per curiam opinion of the Court of Appeals, issued April 9, 2020 (Docket Nos. 343818 and 344240).

6

The panel was skeptical that the affirmative defense of defense of others, traditionally used to excuse *assaultive* conduct, was available in response to a home-invasion prosecution. That skepticism was bolstered by MCL 780.972(2) of the Self-Defense Act (SDA), MCL 780.971 *et seq*., which states that the defense may be invoked when the defendant is "anywhere he or she has the legal right to be." By definition, a home invader is somewhere they do *not* have a legal right to be.

The panel considered *People v Dupree*, 486 Mich 693; 788 NW2d 399 (2010), in which this Court held that the traditional common-law affirmative defense of self-defense could be raised as a defense to the nonassaultive crime of felon in possession of a firearm. The panel thought *Dupree* was distinguishable, though, because the felon-in-possession offense occurred before the effective date of the SDA. The panel thought that whether the defense-of-others defense applied to home invasion was "far from certain, at best," and therefore concluded that "[d]efense counsel cannot be deemed deficient for failing to advance a novel legal argument." *Leffew*, unpub op at 5, quoting *People v Crews*, 299 Mich App 381, 400; 829 NW2d 898 (2013).

Even if the performance were deficient, the panel concluded there was no prejudice. The underlying misdemeanor in Micheline's third-degree home invasion charge was malicious destruction of a building under $200, MCL 750.380(5). *Leffew*, unpub op at 4. The jury received instructions that to commit that offense, Micheline must have destroyed or damaged property "knowing that it was wrong, without just cause of [sic, or] excuse, and with the intent to damage or destroy the property . . . ." *Id*. at 5 (alteration in original). Micheline's defense counsel argued that Micheline had just cause for breaking down the door—she did so to protect Seibert. The panel found this significant: "The jury's verdict

7

indicates that, despite defense counsel's arguments, the jury rejected the theory that Micheline was justified in her actions; there is no reason to conclude that an instruction on defense of others would have altered that conclusion." *Id*. at 6.

Jeremiah's ineffective-assistance-of-counsel claims fared no better. The panel held that like his wife, Jeremiah failed to show that defense of others was available as a defense to home invasion, and Jeremiah's counsel was not deficient for failing to put forward a novel legal argument. Nor was the panel persuaded that the defense was available in response to the felonious-assault charge. Initial aggressors may not claim self-defense or defense of others, and here, Porter testified that Jeremiah "came at" him, grabbed a knife, and tried to stab him. *Id*. at 7. What's more, Jeremiah—like Micheline—was not somewhere he had "the legal right to be," so he could not claim entitlement to the defense under the SDA for that reason, too.

Both defendants sought leave to appeal in this Court. We ordered oral argument on their applications and instructed the parties to address two issues:

> whether the common-law affirmative defense of defense of others may be raised as a defense to the felony and misdemeanor charges against them, see *People v Dupree*, 486 Mich 693 (2010); *People v Triplett*, 499 Mich 52 (2016), and whether trial defense counsel's failure to request such an instruction deprived the defendants of the effective assistance of counsel, see *Strickland v Washington*, 466 US 668 (1984). [*People v Leffew*, 506 Mich 1031, 1031 (2020)].

## II. STANDARD OF REVIEW

The defendants claim that they were denied effective assistance of counsel. That question raises a mixed question of fact and constitutional law. *People v Vaughn*, 491 Mich 642, 650; 821 NW2d 288 (2012). The trial court's findings of fact are reviewed for

8

clear error, and the questions of constitutional law are reviewed de novo. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). A de novo analysis "means that we review the issue independently, without any required deference to the trial court." *Millar v Constr Code Auth*, 501 Mich 233, 237; 912 NW2d 521 (2018).

## III. ANALYSIS

To obtain relief under either the state or federal Constitution for the ineffective assistance of counsel, a defendant must satisfy the two-part test set out in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001).

First, the defendant must establish that counsel's performance was deficient. *Id*. at 600. In evaluating deficient performance we consider "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 US at 690. Second, the error must have prejudiced the defendant. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id*.

### A. THE COMMON-LAW DEFENSE-OF-OTHERS AFFIRMATIVE DEFENSE IS AVAILABLE TO DEFENDANTS ACCUSED OF HOME INVASION

Defense counsel is not ineffective for failing to advance a meritless or frivolous argument. See *People v Riley (After Remand)*, 468 Mich 135, 142; 659 NW2d 611 (2003). Whether the defense-of-others instruction is available to defendants accused of nonassaultive crimes is therefore the first question.

9

Under the defense-of-others doctrine, "[o]ne may use force in defense of another when he or she reasonably believes the other is in immediate danger of harm and force is necessary to prevent the harm; deadly force is permissible to repel an attack which reasonably appears deadly." 3A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 91:59, p 399; see also 2 LaFave, Substantive Criminal Law, § 10.5, p 222 (3d ed). As with self-defense, defense of others is generally not available to a person who is the initial aggressor. See *People v Riddle*, 467 Mich 116, 120 n 8; 649 NW2d 30 (2002).

Though invoked less commonly than its more popular sibling, self-defense, the defense-of-others doctrine has deep roots in Michigan jurisprudence. In 1860, we addressed the narrow class of "excusable homicide[s]" and noted that the accused in such cases acts in "the defense of [his] own life, *or that of his family, relatives or dependants* [sic], within those relations where the law permits the defense of others as of one's self." *Pond v People*, 8 Mich 150, 175 (1860) (emphasis added). In the century and a half following *Pond*, Michigan courts have repeatedly recognized the common-law defense-of-others doctrine. See *People v Curtis*, 52 Mich 616, 622-624; 18 NW 385 (1884) (the defendant in a homicide case "was entitled and bound to take an interest in the life and safety of his brother," and his use of a deadly weapon to that end was not necessarily evidence of malice); *People v Burkard*, 374 Mich 430, 437-438; 132 NW2d 106 (1965), partially abrogated on other grounds by *People v Heflin*, 434 Mich 482; 456 NW2d 10 (1990) (the defendant was entitled to an accurate jury instruction related to his claim that his act of homicide was based on his belief that his wife's life was in danger); *People v Wright*, 25 Mich App 499, 503; 181 NW2d 649 (1970) (per *Curtis*, the defendant had a right to protect his brother, even though that right had no application on the facts of this

10

manslaughter case); *People v Kurr*, 253 Mich App 317; 654 NW2d 651 (2002) (applying the defense-of-others doctrine in a homicide prosecution where the pregnant defendant stabbed a man who was repeatedly punching her stomach); see also Bendinelli & Edsall, *Defense of Others: Origins, Requirements, Limitations and Ramifications*, 5 Regent U L Rev 153 (1995) (tracing the common-law history of the defense-of-others doctrine, as the early English self-defense doctrine gradually evolved to include defense of family members and, eventually, strangers).

The Court of Appeals was not convinced that the defense-of-others affirmative defense was available to defendants charged with home invasion: "[g]enerally, the defense-of-others defense is used to excuse assaultive conduct, i.e., the use of force directly against a person," while home invasion is, by its nature, nonassaultive. *Leffew*, unpub op at 4. But *generally* true is not *always* true, and Michigan and sister jurisdictions recognize both self-defense and defense of others as justifications for nonassaultive crimes. See *Dupree*, 486 Mich at 705-706 (finding self-defense applicable to nonassaultive felon-in-possession charge); *People v Triplett*, 499 Mich 52, 58; 878 NW2d 811 (2016) (the defendant should have been permitted to claim self-defense in response to the nonassaultive crime of carrying a concealed weapon); *People v Goree*, 296 Mich App 293, 305; 819 NW2d 82 (2012) (the trial court erred by instructing the jury that self-defense did not apply to the possessory, nonassaultive felony-firearm charge); *People v Miller,* unpublished per curiam opinion of the Court of Appeals, issued June 5, 2008 (Docket No. 276589), p 5 (noting in a home-invasion prosecution that the "[d]efendant's testimony presented some facts to support a defense of others instruction" before ultimately concluding that failure to provide the requested instruction was not prejudicial on the facts of the case); *People v Torrez*,

11

unpublished per curiam opinion of the Court of Appeals, issued April 24, 2008 (Docket No. 274582), p 2 (extending the defense-of-others justification to home-invasion prosecutions where assault is used to establish an element of the offense). See also *People v Coahran*, 436 P3d 617, 622-623; 2019 COA 6 (Colo App, 2019) (the defendant, charged with the property crime of criminal mischief, was entitled to a jury instruction on self-defense where she kicked at her boyfriend's car door to distract him and free herself from his grasp); *Boget v State*, 74 SW3d 23, 24-25, 31 (Tex Crim App, 2002) (a self-defense instruction was appropriate in response to a criminal-mischief prosecution where the defendant alleged that he had smashed the window of a truck because it was driving recklessly toward him). Therefore, it would not have been novel for Jeremiah's and Micheline's attorneys to request a defense-of-others instruction. Cf. *People v Reed*, 453 Mich 685, 695; 556 NW2d 858 (1996) (defense counsel not deficient for failing to advance a novel legal argument that no Michigan authority had recognized).

This Court's recent caselaw should have made that clear. The Court of Appeals acknowledged that *Dupree* held that self-defense may be invoked against the nonassaultive crime of felon in possession of a firearm, MCL 750.224f, but the panel found *Dupree* distinguishable because it involved conduct that took place before the October 1, 2006 effective date of the SDA. *Leffew*, unpub op at 5.

That factual distinction, though, misreads both *Dupree* and the SDA, which *expanded*, rather than contracted, the ability to invoke the affirmative defenses of self-defense and defense of others. The SDA codified and expanded "the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. Section 2 of the SDA removed the

traditional common-law duty to retreat, so long as the individual engaging in self-defense or defense of others was not committing or had not committed a crime and had a legal right to be where they were when they used force. MCL 780.972; 1 Gillespie, § 1:63, pp 162-163.

But aside from limiting one's duty to retreat, the statute did not modify or abrogate the common-law defenses of self-defense or defense of others. *People v Conyer*, 281 Mich App 526, 530; 762 NW2d 198 (2008); see also *People v Guajardo*, 300 Mich App 26, 35-36; 832 NW2d 409 (2013). As we have said many times, "[w]e will not lightly presume that the Legislature has abrogated the common law." *Velez v Tuma*, 492 Mich 1, 11; 821 NW2d 432 (2012); *Dupree*, 486 Mich at 706; *Triplett*, 499 Mich at 58. But here we don't have to presume because the Legislature left no doubt: § 4 of the SDA states that the statute "does not diminish an individual's right to use deadly force or force other than deadly force in self-defense or defense of another individual as provided by the common law of this state . . . ." MCL 780.974.

The Court of Appeals thought that § 2 of the SDA, which explains that defendants invoking the defense-of-others instruction must be "anywhere he or she has the legal right to be," MCL 780.972(2), was an insurmountable hurdle for Jeremiah and Micheline. The panel reasoned that "a person who has entered a home without permission from the lawful owner appears by definition not to be 'anywhere he or she has the legal right to be.' " *Leffew*, unpub op at 4, quoting MCL 780.972(2). To be sure, kicking down a door and entering a home without permission does not give the kicker legal rights. But § 2 of the SDA isn't relevant. It is only a statutory precondition to standing one's ground under the SDA. Micheline and Jeremiah were not invoking any right to stand their ground in Porter's

13

home.  The statutory duty to retreat was not at issue; Jeremiah's and Micheline's claims of defense of others are rooted not in statute, but in the common law.

*Dupree* agrees.  Indeed, we said that "the traditional common law affirmative defense of self-defense is generally available to a defendant charged with being a felon in possession if supported by sufficient evidence." *Dupree*, 486 Mich at 712.  And the panel missed *Triplett*, in which we relied on *Dupree* to find that a defendant charged with carrying a concealed weapon was entitled to an instruction on self-defense if supported by sufficient evidence because "there is no clear indication that the Legislature abrogated or modified the common-law affirmative defense of self-defense in the [carrying a concealed weapon] statute. . . . " *Triplett*, 499 Mich at 57-58 (quotation marks omitted).  Here again; the SDA neither abrogated nor limited the common-law affirmative defense of defense of others.

The Court of Appeals' view would raise public-policy concerns, too.  The Attorney General, representing the Arenac County prosecutor on appeal, conceded this issue and explained why: It cannot be the law that "someone might be excused from taking the life of a kidnapper if they reasonably and sincerely believed a hostage's life was in imminent danger, but they could not be excused from crossing the threshold of the kidnapper's home in order to kill that kidnapper."

The Court of Appeals erred by assuming that defense of others is unavailable to defendants facing prosecution for nonassaultive crimes.  The applicability of the defense must be determined on the particular facts of each case, not the charges the prosecution brings.

14

## B. THE FAILURE TO REQUEST A DEFENSE-OF-OTHERS JURY INSTRUCTION FELL BELOW AN OBJECTIVE STANDARD OF REASONABLENESS

That the common-law affirmative defense of defense of others may apply to nonassaultive crimes is only step one. Whether Jeremiah and Micheline were entitled to the instruction is next. We conclude that they were and that their attorneys' failures to request the instruction constituted deficient performance, satisfying *Strickland*'s first prong.

Under the state and federal Constitutions, a criminal defendant has a right to present a defense. Const 1963, art 1, § 13; US Const, Ams VI and XIV; *People v Hayes*, 421 Mich 271, 278; 364 NW2d 635 (1984). "Instructional errors that directly affect a defendant's theory of defense can infringe a defendant's due process right to present a defense." *Kurr*, 253 Mich App at 326-327. That said, an affirmative-defense instruction is not automatic upon request. "In order to properly raise the defense, the defendant has the burden of producing 'some evidence from which the jury can conclude that the essential elements of [the defense] are present.'" *People v Lemons*, 454 Mich 234, 246; 562 NW2d 447 (1997), quoting CJI2d 7.6, commentary; see also *Guajardo*, 300 Mich App at 34-35; *People v Crawford*, 232 Mich App 608, 619; 591 NW2d 669 (1998).

The defendant's burden is not a heavy one. *United States v Johnson*, 416 F3d 464, 467 (CA 6, 2005). "Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense." *United States v Garner*, 529 F2d 962, 970 (CA 6, 1976). In short, a defendant who puts forward some evidence in support of their affirmative-defense theory is entitled to an instruction on that theory. *People v Rajput*, 505 Mich 7, 10-11; 949 NW2d 32 (2020); *Riddle*, 467 Mich at 124. "Once

15

a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of [defense of others] exist, the prosecution bears the burden of disproving the affirmative defense of [defense of others] beyond a reasonable doubt." *Dupree*, 486 Mich at 712. "The sufficiency of the evidence of a defendant's [defense-of-others] theory is 'for the jury to decide under proper instructions . . . .' " *Rajput*, 505 Mich at 11, quoting *People v Hoskins*, 403 Mich 95, 100; 267 NW2d 417 (1978).

Jeremiah and Micheline have cleared the hurdle of putting forward "some evidence" that they reasonably believed their entry into Porter's home was necessary to prevent additional, imminent harm to Seibert. Micheline testified that she watched Porter grab Seibert by the back and drag her away from the front door as Seibert screamed:

> Once I heard her scream for help, I knew I had to help her. So I ran around back, and I originally tried to open the door but it was locked. So I took my boots, the ones I'm wearing today, and gave two or three kicks, and it came open.

Jeremiah likewise testified that after he watched Porter "proceed to drag [Seibert] into the back of the house" and "c[o]me up behind her, grab[] her, and thr[o]w her straight back on the floor," he followed his wife to the back of the home.

Jeremiah also testified that he acted to protect Micheline. Moments after hearing a loud bang, Jeremiah came to the back door and saw his wife lying facedown on Porter's broken-glass-strewn kitchen floor, convulsing mid-seizure. "And I come in to help her . . . . I was just trying to think of how I could help my wife."

That testimony established that Jeremiah and Micheline each believed that their entry into Porter's home was undertaken with the reasonable belief that doing so was

16

necessary to protect another. Cf. *People v Fowler*, unpublished per curiam opinion of the Court of Appeals, issued May 26, 2000 (Docket No. 217832), p 3 (finding that defense counsel did not perform deficiently in failing to request a self-defense instruction when the defendant testified that he had not fired the weapon in self-defense, but to frighten the victims and show that his gun was real).

Indeed, Jeremiah and Micheline's trial strategy turned on a defense-of-others theory. As Micheline's attorney said in opening: "She was going in there to save her mother-in-law. She was going in there to rescue someone." And as Jeremiah's attorney said in closing: "Did Mr. Leffew do anything wrong[? No], he went there and rescued, as he calls it, his mother-in-law, who'd been his mother for 25 years. He went there because he was requested to be there by [Seibert]."

Both defense attorneys presented evidence and arguments leading the jury to an acquittal under a defense-of-others theory only to deprive jurors of a judge-given map to reach that destination. Their failures to request the defense-of-others instruction that supported their trial strategy was objectively unreasonable. Cf. *People v Pickens*, 446 Mich 298, 330; 521 NW2d 797 (1994) (defense counsel's failure to present a diminished-capacity defense reflected a strategic choice to focus instead on the insanity defense); *People v Dunigan*, 299 Mich App 579, 583-584; 831 NW2d 243 (2013) (theory of the defense precluded the need for the jury instruction at issue because "that instruction would have been inconsistent with, and potentially detrimental to, defendant's theory that he was not the perpetrator and had been falsely accused by the victim"); *People v Robinson*, 154 Mich App 92, 94; 397 NW2d 229 (1986) (defense counsel's failure to request a jury

instruction on lesser offenses was a matter of trial strategy because such instructions may have reduced the chance of acquittal).

## C.  DEFENSE COUNSEL'S ERRORS PREJUDICED BOTH DEFENDANTS

Deficient performance isn't enough for relief; the error must have prejudiced Jeremiah and Micheline.  That is, there must be a reasonable probability of a different outcome had the error not been committed.  *Strickland*, 466 US at 694.

Jury-instruction challenges often focus on imperfections.  "Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights."  *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001).  Likewise, "[i]nstructional errors that omit an element of an offense, or otherwise misinform the jury of an offense's elements, do 'not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' "  *People v Kowalski*, 489 Mich 488, 501; 803 NW2d 200 (2011), quoting *Neder v United States*, 527 US 1, 9; 119 S Ct 1827; 144 L Ed 2d 35 (1999).

But Jeremiah and Micheline's jury was not presented with merely an "imperfect instruction," *id*. at 501-502, about the defense-of-others justification; the jury was provided with *no* instruction.  Even so, "[n]o error results from the absence of an instruction as long as the instructions as a whole cover the substance of the missing instruction."  *Kurr*, 253 Mich App at 327.  Because "[j]ury instructions are to be read as a whole rather than extracted piecemeal to establish error," *id*., we consider each defendant's claim of prejudice separately, given their entire individual jury instructions.

18

## 1. MICHELINE'S HOME-INVASION CHARGE

Micheline was charged with third-degree home invasion, MCL 750.110a(4)a, which requires a showing that the defendant either intended to, or did, commit a misdemeanor during the breaking and entering of a dwelling. In Micheline's case, the underlying misdemeanor was malicious destruction of property less than $200, MCL 750.380(5), based on the damage she caused to Porter's door. One element of malicious destruction of property less than $200 is that the defendant knows what they are doing is wrong. Micheline's jury was instructed:

> In determining whether she committed that misdemeanor you must consider, with the evidence, and she's not charged with a misdemeanor, but you have to find that there was an intent to commit a misdemeanor before you can find her guilty of the breaking and entering.
>
> And that Malicious Destruction of Property, of a Building under $200, the elements are: First, that the building or anything permanently attached to it belongs to someone else. Second, that the defendant destroyed or damaged that building or anything permanently attached to it. Third, that ***the defendant did this knowing that it was wrong***, ***without just cause* [*or*] *excuse***, and with the intent to damage or destroy the property, and fourth, that the extent of the damage was some amount less than $200. [Emphasis added.]

The Court of Appeals held that because the jury was informed that it could only convict if it found Micheline destroyed Porter's property "knowing that it was wrong, without just cause [or] excuse," the lack of a defense-of-others instruction did not prejudice her. *Leffew*, unpub op at 5-6. As the panel saw it: "The jury's verdict indicates that, despite defense counsel's arguments, the jury rejected the theory that Micheline was justified in her actions; there is no reason to conclude that an instruction on defense of others would have altered that conclusion." *Id*. at 6. The panel seems to have reasoned that the jury's

19

conviction meant it found Micheline had acted "without just cause or excuse," so a defense-of-others instruction would not have made a difference.

We disagree. Had defense counsel requested a defense-of-others jury instruction, the trial court would have explained to the jury that:

> (1) The defendant claims that she acted in lawful defense of Lisa Seibert. A person has the right to . . . [act] in defense of another person under certain circumstances. If a person acts in lawful defense of others, her actions are justified and she is not guilty of home invasion.

> (2) You should consider all the evidence and use the following rules to decide whether the defendant acted in lawful defense of Lisa Seibert. Remember to judge the defendant's conduct according to how the circumstances appeared to her at the time she acted.

> (3) First, at the time she acted, the defendant must not have been engaged in the commission of a crime.

> (4) Second, when she acted, the defendant must have honestly and reasonably believed that she had to . . . [act] to protect Lisa Seibert from the imminent unlawful use of force by another. If her belief was honest and reasonable, she could act at once to defend Lisa Seibert, even if it turns out later that she was wrong about how much danger Lisa Seibert was in.

> (5) Third, . . . when you decide whether [the defendant's actions] seemed necessary, you should consider whether the defendant knew about any other ways of protecting Lisa Seibert, but you may also consider how the excitement of the moment affected the choice the defendant made.

> (6) Fourth, the right to defend another person only lasts as long as it seems necessary for the purpose of protection.

> (7) Fifth, the person claiming self-defense must not have acted wrongfully and brought on the assault. However, if the defendant only used words, that does not prevent her from claiming self-defense if she was attacked. [See M Crim JI 7.22, as amended September 2007.]

The defense-of-others instruction would have come with a corollary jury instruction explaining that the prosecution had to disprove that Micheline acted in defense of Seibert

beyond a reasonable doubt. M Crim JI 7.20; see also *Dupree*, 486 Mich at 709-710 ("Having concluded that the common law affirmative defense of self-defense may be interposed in this felon-in-possession case, we also conclude that the prosecution bears the burden of disproving the common law defense of self-defense beyond a reasonable doubt. . . . This allocation of the burden of proof is well settled in this Court . . . .").

We disagree with the Court of Appeals; counsel's failure to request a defense-of-others jury instruction prejudiced Micheline. First, the "without just cause or excuse" language in the malicious-destruction-of-property instruction, which offered no guidance about what might constitute "just cause or excuse," was inadequate to explain why Micheline's conduct was, in fact, excused. Her defense hinged on an excuse the law recognizes—defense of others—but those dots were never connected for the jury.

The prosecution has argued that "without just cause or excuse" is so broad that it benefited Micheline and made her acquittal more likely. But the opposite is true. "[W]ithout just cause or excuse" is broad, but it is also too undefined to be analytically useful in this context. The affirmative-defense instruction, *because of its specificity*, would have told the jury that the circumstances described by Micheline are defined by the law as just cause. The jury would not have had to guess about what causes are sufficiently "just" to break into a home or whether Micheline, knowing that breaking down a door "was wrong," was still justified in doing so. Instead, the jury would have been told that Micheline "ha[d] the right to . . . [act] to defend another person under certain circumstances" and could then have decided whether the prosecution proved beyond a reasonable doubt that Micheline's belief that her conduct was necessary to protect Seibert was not reasonable. M Crim JI 7.22, as amended September 2007.

21

Second, and relatedly, the defense-of-others instruction would have provided jurors a framework for how to judge Micheline's conduct given the divergent testimony. The court would have told the jury that it should judge Micheline's "conduct according to how the circumstances appeared to her at the time" and that it could consider "how the excitement of the moment affected the choice [Micheline] made." M Crim JI 7.22(2) and (5), as amended September 2007. And the jury would have learned that so long as Micheline's belief was honest and reasonable, it did not matter if Seibert had not, in fact, been facing imminent, unlawful force. M Crim JI 7.22; *Heflin*, 434 Mich 482. There is a reasonable probability that jurors who concluded that Seibert was not in imminent danger felt compelled to convict Micheline, without understanding that what was important was Micheline's perspective. *People v Adamowicz*, 503 Mich 880, 880 (2018) ("In a self-defense claim, the accused's conduct is judged according to how the circumstances appeared to him at the time he acted.").

If the "without just cause [or] excuse" clause in the malicious-destruction-of-property instruction could replace the defense-of-others instruction, it is hard to imagine how a defendant could ever show prejudice whenever the charged offense includes some reference to a lack of justification. A defendant charged with first-degree premeditated murder, for which the prosecution must establish that the "killing was not justified [or] excused," M Crim JI 16.1(6), who acted in self-defense, could not establish prejudice if their attorney failed to request a self-defense instruction. The affirmative-defense instruction gives meaning to the offense element.

The jury heard four accounts of what happened. Had the court instructed Micheline's jury that the law allowed her conduct if she reasonably and honestly believed

22

Seibert was in danger, a different outcome is reasonably probable. The absence of the instruction is "sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694.

## 2. JEREMIAH'S HOME-INVASION CHARGE

The trial court instructed the jury about the elements of Jeremiah's home-invasion charge:

> The defendant, Mr. Leffew, is charged with Home Invasion in the 1st Degree. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, that the defendant entered a dwelling without permission. It does not matter whether the defendant got his entire body inside. If the defendant put any part of his body into the dwelling without permission, that is enough to count as an entry. Second, that when the defendant entered, was present in, or was leaving the dwelling, he committed the offense of assault. Third, that when the defendant entered, was present in, or was leaving the dwelling, either one of the following circumstances existed, the circumstance in this case was that another person was lawfully present in the dwelling.

The court also explained the elements of assault, the underlying offense supporting Jeremiah's home-invasion charge:

> The defendant is charged with the crime of Felonious Assault, that would be Mr. Leffew, and felonious assault is just another name for assault with a dangerous weapon. To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant either attempted to commit a battery on Michael Porter or did an act that would cause a reasonable person to fear or apprehend an immediate battery. A battery is a forceful or violent touching of the person or something closely connected with the person. Second, that the defendant intended either to injure Michael Porter, or to make Michael Porter reasonably fear an immediate battery. Third, that at the time, the defendant had the ability to commit a battery, appeared to have the ability, or thought he had the ability. Fourth, that the defendant committed an assault with a knife.

23

That the jury was not told that the law excused Jeremiah's conduct if he reasonably and honestly believed Seibert or Micheline were in imminent danger prejudiced him for many of the same reasons it prejudiced his wife. But where Micheline's underlying charge of malicious destruction of a building required the prosecution to show she acted "knowing that it was wrong, without just cause or excuse," neither offense Jeremiah was charged with included a similar element. It is hard to imagine how a juror hearing the instructions could acquit Jeremiah. Jeremiah conceded the elements of the home-invasion charge; he argued that he was justified nonetheless because he was acting to protect Seibert and Micheline. Had the jury been told that the law supported Jeremiah's defense, a different outcome was reasonably probable.

The prosecution believes that because the jury was not persuaded that Micheline acted with "just cause or excuse," we can assume that a defense-of-others instruction would not have made a difference for Jeremiah. That is, because Jeremiah and Micheline had the same factual defense, and the jury didn't believe Micheline's actions were justified, it would likewise not have been persuaded that Jeremiah's actions were justified.

This argument depends on an understanding that Micheline's jury instructions were sufficient. They were not. But the argument fails for a more fundamental reason, too. It asks us to assume that jurors, when tasked with judging two defendants in a joint trial, would, without being instructed to do so, impute jury instructions for one defendant to the other. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). If the court had explained to the jury that the law supported Jeremiah's defense, a different outcome was reasonably probable.

24

D. THE FAILURE TO REQUEST A DEFENSE-OF-OTHERS INSTRUCTION FOR JEREMIAH'S FELONIOUS-ASSAULT CHARGE CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL

The jury convicted Jeremiah of felonious assault for his knife-wielding confrontation with Porter in the kitchen. The Court of Appeals correctly noted that a defendant cannot assert the affirmative defenses of self-defense or defense of others if they are the initial aggressor. See *Riddle*, 467 Mich at 119, 120 n 8. The panel summarized Jeremiah's and Porter's divergent testimonies before reaching two conclusions.

The panel first held that the affirmative defense was unavailable to Jeremiah because he was the initial aggressor. *Leffew*, unpub op at 8 n 9. To reach this conclusion, the panel credited Porter's version of events over Jeremiah's. But the question of who was the initial aggressor was for the jury to decide, not the panel. *People v Kolanek*, 491 Mich 382, 411; 817 NW2d 528 (2012) ("[T]hose issues requiring factual resolution and pertaining to the credibility of witnesses and weight of the evidence" are left to the jury); see also *Rajput*, 505 Mich at 12 (holding that the Court of Appeals engaged in "improper fact-finding" when it found that the defendant was not entitled to a self-defense instruction because he was the initial aggressor); *People v Martin*, unpublished per curiam opinion of the Court of Appeals, issued November 18, 2021 (Docket No. 348584), p 4 ("Although *Rajput* was a case in which the jury instructions were denied—not one in which defense counsel failed to request them—the same principles apply.").

The relevant question is whether Jeremiah put forward "some evidence" that he acted in defense of others and was not the initial aggressor. Jeremiah testified that right after he entered the home, Porter began punching him repeatedly. What's more, because Jeremiah claimed that he was also acting to defend his wife, Porter's act of smashing a

25

glass ashtray over Micheline's head moments before Jeremiah entered the home could also be considered the initial act of aggression. These are questions a jury determines, not the Court of Appeals.

The Court of Appeals also concluded that "[t]here is no indication, under either version of events, that Micheline was under any threat of physical assault by Porter at the time Jeremiah gained possession of the knife." *Leffew*, unpub op at 8. This second conclusion presents a closer question. Jeremiah did not specifically testify that he reasonably and honestly believed that his wife faced imminent harm. But he did say that when he entered the home and wielded the knife, he saw his wife lying facedown in a pool of her own blood and having a seizure in the same room as Porter. These facts might have given Jeremiah reason to believe that his severely injured wife was in imminent danger of further attack by Porter. Indeed, upon picking up the knife, Jeremiah testified that he pleaded with Porter, "Please, just stop and let us go." He testified that he picked up the knife "to defend [him]self and [his] wife." A jury could find that Jeremiah honestly and reasonably believed that he needed to use force to protect his injured wife.

Jeremiah's counsel's failure to request a defense-of-others instruction for the felonious-assault charge prejudiced Jeremiah. As with the home-invasion charge, counsel conceded that the elements of felonious assault had been satisfied: Jeremiah had acted in a way to reasonably cause Porter to fear a violent touching. He had intended to cause Porter fear. He had the ability to cause an injury. And he was armed with a knife. He conceded all of this because, he explained, Jeremiah acted to defend Seibert and Micheline. The jury heard Jeremiah and his counsel concede that the prosecution had proven all the elements of felonious assault but never knew that the law excused Jeremiah's conduct if his belief

26

that his loved ones were in danger was honest and reasonable. That is, the jury was never given any avenue to an acquittal. Had it been properly instructed, it is reasonably probable that a different outcome would have resulted.

## IV. CONCLUSION

Jeremiah and Micheline have consistently maintained that their otherwise illegal entry into Porter's home and Jeremiah's assault with a knife were justified under an honest and reasonable belief that their conduct was necessary to protect another. The Court of Appeals erred by determining that defendants' attorneys, whose defense theory at trial was that their clients had acted to defend others, did not render ineffective assistance of counsel by failing to request a jury instruction reflecting that defense. The defense attorneys in this case provided ineffective assistance, and their errors prejudiced their clients, who are entitled to a new trial. We therefore reverse the judgment of the Court of Appeals and remand for a new trial.

Bridget M. McCormack
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

27